Michael JACKSON, Petitioner–
Appellant,

v.

Arthur CALDERON, Warden,
Respondent–Appellee.

No. 97–99032.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 10, 1998

Filed May 8, 2000

Allyn O. Kreps, Troy & Gould; Robert S. Draper, O'Melveny & Myers, Los Angeles, California, for the petitioner-appellant.

Donald de Nicola, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

Before: CANBY, O'SCANNLÀIN and THOMAS, Circuit Judges.

Opinion by Judge CANBY; Partial Concurrence and Partial Dissent by Judge O'SCANNLAIN.

CANBY, Circuit Judge:

In 1983, Michael Jackson, while grossly intoxicated with phencyclidine (PCP), shot and killed West Covina Police Officer Kenneth Wrede. Several witnesses testified to Jackson's bizarre behavior before the event, and to the brief encounter that ended in the shooting. Jackson concedes that he shot Officer Wrede, but he has always maintained that he has no recollection of the encounter whatsoever. The question before us is whether Jackson was provided

with effective assistance of counsel in presenting his defense to the capital charge that resulted.

Jackson was convicted of first-degree murder and sentenced to death. The California Supreme Court affirmed the conviction and sentence. *See People v. Jackson,* 49 Cal.3d 1170, 264 Cal.Rptr. 852, 783 P.2d 211 (1989) (in bank), *cert. denied,* 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990). Jackson subsequently exhausted his state collateral remedies and then filed a petition for habeas corpus in the district court. *See* 28 U.S.C. § 2254. The district court, after holding an evidentiary hearing on some of the claims, denied the petition. The district court then granted a certificate of probable cause and stayed Jackson's execution pending this appeal. We now affirm the judgment of the district court insofar as it upholds Jackson's conviction for first degree murder, but we reverse that part of the judgment that upholds the sentence of death. We conclude that Jackson received ineffective assistance of counsel, to his prejudice, at the penalty phase of his trial.

## FACTUAL BACKGROUND

On the morning of August 31, 1983, Jackson was with friends smoking PCP-laced cigarettes in a garage in West Covina, California. He was a regular PCP user, and on this occasion he had smoked more than one laced cigarette. Suddenly, he jumped up, kicked off his shoes, and ran outside into the street. There several people observed him jumping around, falling down, and diving head first onto the pavement. One witness saw Jackson start to cross the street several times, only to change his mind each time seemingly without cause. The same witness said Jackson was pulling and slapping at his hair.

A few blocks away, a motorist who had seen Jackson stopped to report Jackson's unusual behavior to Officer Wrede. Wrede radioed from his patrol car that he was going to investigate a "possibly dusted" suspect, and requested additional officers.

Wrede then drove to Jackson's location and confronted Jackson. He asked Jackson to sit down on the curb, but Jackson did not comply and began to walk away. Wrede then struck Jackson in the back of the legs with his baton. Jackson and Wrede then wrestled each other to the ground. As they got back up, Wrede repeatedly sprayed Jackson in the face with mace, to no apparent effect. Jackson went to an adjacent yard and attempted unsuccessfully to pull up a tree. He removed two long support stakes and threw them at Wrede.

Wrede ran to his patrol car and opened the driver's door, possibly to radio again for back-up. Jackson went to the front passenger-side door, opened it, and reached for a shotgun that was in a rack inside of the car. Jackson and Wrede wrestled for control of the shotgun and Jackson prevailed, ripping the gun and its rack from the mounting and out of the car. Wrede drew his gun and moved to the left rear of the car, while Jackson remained on the passenger side and pointed the shotgun across the top of the car toward the light bar and Wrede. After some difficulty because the rack was still fastened to the shotgun, Jackson managed to pump a shell into the chamber. There was some conflict in the evidence over what happened next, but at some point Jackson lowered his gun onto the roof and Wrede lowered his gun. Jackson then picked the shotgun back up and fired, hitting the light bar and Wrede. One pellet hit Wrede in the eye, killing him. The entire encounter between Jackson and Wrede had lasted less than four minutes.

Jackson then stumbled away from the patrol car, still carrying the shotgun and rack. Police back-up units arrived less than a minute after the shooting. Jackson walked toward one officer, who testified that Jackson said, "Now I'm gonna kill all the fucking pigs." No other witness testified to hearing that statement. One officer yelled for others to shoot; Jackson replied, "I'm gonna shoot you." Another officer released a police dog, which at-

tacked Jackson. Jackson stunned the dog by hitting him with the shotgun, and said, "I'm going to kill you, too, dog." The dog recovered and bit Jackson, causing him to drop the shotgun. Three officers then tackled Jackson, who resisted and reached unsuccessfully for the gun worn by one of them. The officers succeeded in subduing and handcuffing Jackson.

Jackson was taken to a police station, but his blood pressure fell to 90/40 and he was removed to Queen of the Valley Hospital by 1:30 p.m. At the hospital, Jackson was unable to respond to verbal commands. Medical records describe him as incoherent, in shock, and semi-conscious. A blood sample was taken and was later found to contain PCP in the amount of 176 nanograms per milliliter. At 3:00 p.m., an officer conducted a booking interview. Some time later, according to a nurse's testimony, Jackson without any questioning or prompting asked, "Why am I under arrest? Are you charging me with killing a cop?"

Shortly after 4:00 p.m., Jackson was transferred to the jail ward of the Los Angeles County Medical Center, where two officers read him his *Miranda* rights. One of the officers then interrogated Jackson, and testified that Jackson asked what he was arrested for. When told "murder," Jackson responded in a questioning tone of voice, "I killed a policeman?" At the end of the interrogation, as the officer was leaving, Jackson said, "I didn't kill that policeman."

The next day, the same officer and his partner returned to interrogate Jackson further. The officer testified that Jackson waived his *Miranda* rights, and that Jackson remembered the officers from the previous day, stating that they were "the cops who say I killed that officer with a shotgun." The officer testified that neither he nor his partner had told Jackson that a shotgun had been used.

Jackson remained in the jail ward of the Medical Center for some three weeks. His trial began some six months after the incident.

## THRESHOLD PROCEDURAL ISSUES

The State raises two procedural points that we address before considering the claims of ineffective assistance of counsel. First, the State contends that it is entitled to the expedited procedures and greater deference to state court rulings provided by Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 107, 110 Stat. 1214, 1221–26 (Apr. 24, 1996) (codified at 28 U.S.C. §§ 2261–2266). As the State recognizes, most of the provisions of the Act do not apply to this case because Jackson's petition was filed in district court prior to the Act's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Congress provided, however, that Chapter 154 was to apply to all cases "pending on or after the date of enactment" of the Act. Pub.L. No. 104–32, § 107(c), 110 Stat. 1226. The State contends that it meets the various criteria that Chapter 154 establishes as conditions of its applicability to a "unitary review" state. *See* 28 U.S.C. § 2265. We need not examine this claim further, because we recently rejected an identical argument by the State in *Ashmus v. Woodford*, 202 F.3d 1160 (2000) (amended opinion). *Ashmus* controls here.

The State next contends that Jackson's ineffective-assistance claims are all procedurally defaulted because the California Supreme Court denied those collateral claims "both on the merits and as untimely." The untimeliness ruling, argues the State, is an independent state procedural ground that precludes federal habeas corpus relief. *See Coleman v. Thompson*, 501 U.S. 722, 729–30, 734–35, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). For the procedural default rule to apply, however, "a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported de-

fault." *Wells v. Maass,* 28 F.3d 1005, 1010 (9th Cir.1994) (citing *Ford v. Georgia,* 498 U.S. 411, 424–25, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)). Prior to the California Supreme Court ruling in *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), California's untimeliness rule did not meet that standard, and consequently did not bar federal habeas review. *See Morales v. Calderon,* 85 F.3d 1387, 1388, 1393 (9th Cir.1996). In *Morales,* we found no need to determine whether *Clark* clarified California's timeliness requirement sufficiently to raise a bar to federal review, because *Clark* was decided after the California Supreme Court denied Clark's petition. *Id.* Here, we reach the same conclusion, because *Clark* was decided only thirty-two days, and became final only two days, before Jackson's state habeas petition was filed in the California Supreme Court. Any undue delay on the part of Jackson necessarily occurred before *Clark. See Calderon v. United States Dist. Ct. (Bean),* 96 F.3d 1126, 1128, 1129–31 (1996) (applying *Morales* to find no procedural default when state habeas petition was filed nine months after *Clark* became final).[1] Jackson's federal habeas claims of ineffective assistance of counsel therefore are not procedurally defaulted. We address them now.

## INEFFECTIVE ASSISTANCE: GUILT PHASE

Jackson raises many claims of ineffective assistance during the guilt phase, but the primary contentions may be grouped into five general categories: (1) failure to investigate the circumstances of Jackson's statements at the hospitals; (2) failure to move to suppress those statements; (3) failure to investigate and controvert at trial the statements made by petitioner after the back-up police arrived on the scene; (4) failure to prepare and utilize medical evidence regarding Jackson's lack of premeditation due to his intoxication; and (5) failure to interview and prepare defense witnesses prior to putting them on the stand.

■■■ Our standard for reviewing these claims is *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* requires Jackson to show that his attorney's performance was unreasonable in light of prevailing professional norms, *see id.* at 687–88, 104 S.Ct. 2052, *and* that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [2] *Id.* at 694, 104 S.Ct. 2052. We review de novo the district court's determination that Jackson has failed to meet the *Strickland* requirements. *See Johnson v. Baldwin,* 114 F.3d 835, 838 (9th Cir.1997).

### 1. *Investigation of Hospital Statements.*

■■■ Jackson asserts that his counsel utterly failed to investigate the circumstances of his damaging hospital statements, which collectively indicated that Jackson recollected killing a policeman with a shotgun. Counsel never had his investigator look into those circumstances,

---

1. In any event, our court has very recently held that, as of April 1996, the California Supreme Court had not made it clear that its denials for untimeliness involved no decision of federal constitutional law. *See La Crosse v. Kernan,* 211 F.3d 468, 473 (9th Cir.2000). Accordingly, the 1993 untimeliness ruling against Jackson would not constitute an independent state ground that would procedurally default his claims. *See id.*

2. We reject the State's contention that, in addition to the *Strickland* requirement of prej-

udice, we also must conduct a standard harmless-error review of any *Strickland* violations. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Lockhart v. Fretwell,* 506 U.S. 364, 369 n. 2, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The *Strickland* prejudice analysis is complete in itself; there is no place for an additional harmless-error review. *See Baylor v. Estelle,* 94 F.3d 1321, 1325 (9th Cir.1996).

because the investigator was never told the statements had been made. Jackson contends that a proper investigation might have revealed that police or hospital personnel had revealed to Jackson that he had been arrested for shooting a policeman with a shotgun.

We assume for purposes of decision that counsel's failure fell below the *Strickland* standard of competence.[3] Jackson, however, has wholly failed to show that a proper investigation would have revealed any such sources for Jackson's information. No evidence was offered in district court that anyone among the police or hospital staffs referred to the nature of the incident within Jackson's hearing. Jackson therefore fails to meet the prejudice requirement of *Strickland.*

Jackson invokes *Evans v. Lewis,* 855 F.2d 631 (9th Cir.1988), in which this court held that a defense counsel's failure to secure a timely mental examination of the defendant was prejudicial because it prevented a physician at a later resentencing from testifying with reasonable medical certainty to the defendant's mental illness at the time of the crime. *See id.* at 638–39. In *Evans,* however, we relied upon substantial evidence to show that the defendant *had* in fact been mentally diseased at the time of the crime. *See id.* Here, we have only speculation concerning the possibility that someone informed Jackson, after the event but prior to his statements, that he had been arrested for shooting a policeman with a shotgun. To find prejudice on this record would be to presume prejudice solely from counsel's deficient performance, which *Strickland* says we may not do. *See Strickland,* 466 U.S. at 693, 104 S.Ct. 2052.

### 2. *Failure to Move to Suppress Hospital Statements.*

■ The district court held, and we agree, that counsel's failure to challenge Jackson's first and third statements on *Miranda* grounds did not constitute deficient performance. It is true that Jackson was not long out of his comatose condition when he made the first statement: "Why am I under arrest? Are you charging me with killing a cop?" All of the evidence regarding that statement, however, indicated that it was volunteered and was not a response to any question or assertion. As a spontaneous statement, it would not have been excludable under *Miranda. See Oregon v. Elstad,* 470 U.S. 298, 312–14, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

■ Jackson's third hospital statement was made the day after his arrest, after he had been informed of his *Miranda* rights. Jackson recognized his interrogators as "the cops who say I killed that officer with a shotgun," when the officers had previously said nothing about a shotgun. There is no evidence that Jackson was impaired at the time, and there is evidence that he was not. There is no evidence of coercion or other improper tactics by the police. Jackson's counsel accordingly had no grounds for moving to suppress the statement, and his decision not to make such a motion does not constitute deficient performance.

■ Counsel might have had grounds under *Miranda,* however, to challenge Jackson's second hospital statements, made after he had been advised of his rights and told that he had been arrested for murder: "I killed a policeman?" and "I didn't kill that policeman." We assume, therefore, for purposes of decision that the failure to suppress these statements fell below the *Strickland* standard of competent performance. In light of the admissibility of Jackson's first and third hospital statements, however, there is no reasonable probability that exclusion of the sec-

---

**3.** We need not decide whether counsel's performance was deficient when the claim of ineffectiveness may be rejected for lack of prejudice. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

ond statements would have changed the result of the trial.[4]

### 3. Failure to Investigate and Controvert Jackson's Pre–Arrest Statements.

▆▆▆ Jackson's contention that counsel failed to investigate his statements made in the presence of the back-up police focus primarily on one statement testified to by Officer Mohler: "Now I'm going to kill all the fucking pigs." There is no question that the statement was damaging to Jackson; it constituted evidence both of conscious awareness and of the fact, essential to the jury's finding of special circumstance, that Jackson knew he had shot a police officer. Jackson contends that, because no other witness testified to hearing the statement, it was deficient performance and prejudicial for his counsel not to have interviewed those witnesses and made more at the trial of the fact that no one other than Officer Mohler had heard the statement.

Jackson's counsel had told his investigator to interview every witness whose statement appeared in the "murder book" assembled by the State and provided to . counsel. The investigator knew that he would have difficulty obtaining consent of the police officers, and he succeeded in interviewing none of them. Their refusal to be interviewed cannot be attributed to a fault of Jackson's counsel.

We assume for purposes of decision that counsel was deficient in failing to interview the civilian witnesses regarding the statement but, again, Jackson has not demonstrated prejudice. The other officer nearest to Jackson at the time of the statement testified on cross-examination that he had not heard a reference to "pigs." Jackson's counsel did not exploit this difference, but the prosecutor in final argument noted

that Officer Mohler had heard the statement but the other officer had not. Jackson's counsel also did not quiz Officer Mohler on the difference between his written statement, which said that Jackson had "yelled" the words, and his testimony that Jackson had "said" the words. Counsel did elicit from Officer Mohler that he had been 70 feet away from Jackson when Jackson "said" the words.

We conclude that any deficiencies of counsel in regard to the statement would not give rise to a reasonable probability of a change in the result if they had been cured. Officer Mohler's testimony itself was not shaken, and he was directly facing Jackson at the time of the statement. As for the civilian witnesses, Jackson did not show in district court that any of them were in a position to hear what Jackson said; no such witnesses testified in the matter. We conclude that *Strickland* prejudice has not been shown.

### 4. Failure to Prepare and Present Medical Evidence.

One of the more difficult issues raised by Jackson is his contention that his counsel was professionally deficient in his presentation, or non-presentation, of medical evidence. There is no question that medical evidence was crucial; Jackson had shot Officer Wrede in the presence of a number of witnesses and there was no disputing the deed. The only question for the jury concerned Jackson's mental state.

Counsel did secure the services of two psychiatrists who interviewed Jackson, and a third who did not but who testified regarding the toxic qualities of PCP. The first two psychiatrists never testified, however. Counsel had instructed both of them identically, to determine, among other things, whether Jackson had the mental capacity to form a specific intent, to delib-

---

**4.** Indeed, with the first and third statements in evidence, counsel may have made a reasonable choice in attempting to make the statements work in Jackson's favor because they were phrased as questions, implying that

Jackson did not remember the incident. If counsel's choice was a reasonable tactical one, his performance was not deficient. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

erate or premeditate, or to harbor malice. Counsel did not ask the psychiatrists to investigate Jackson's background, but both did.

The first psychiatrist, Dr. Skrdla, furnished an opinion nine days after his appointment. Apparently to counsel's surprise, Dr. Skrdla did discuss Jackson's background, including his dishonorable discharge from the army, four armed robberies committed when he was 15 or 16 years of age, and various other matters. Dr. Skrdla opined that Jackson showed no evidence of organic brain disease or functional psychosis, and that he was competent to stand trial. Dr. Skrdla further opined that Jackson was intoxicated but legally sane at the time of the offense. He stated that Jackson was "believed to have possessed the mental capacity to form the specific intent to kill, and actually formed such intent." Dr. Skrdla further stated, however, that "[b]ecause of his drug induced state of intoxication, he is not believed to have actually deliberated, premeditated, nor meaningfully and maturely reflected upon the gravity of his contemplated acts. However, he is believed to have been capable of harboring malice aforethought."

■ This opinion was clearly a mixed bag, and Jackson's counsel testified in district court that he did not want to put Dr. Skrdla on the stand because he was not willing to concede that Jackson was capable of forming, and did form, the specific intent to kill. He also did not want to risk opening the door to the background information. This decision is clearly a judgment call within the range of competent counsel. Indeed, the district court ruled that Jackson had not raised the issue of his counsel's failure to utilize Dr. Skrdla at the trial. As Jackson now argues the matter, the importance of Dr. Skrdla's report is that it was delivered to counsel four months before Dr. Mead's report, which also went into Jackson's background. If counsel wanted to avoid inclusion of background material, according to Jackson,

counsel should have warned Dr. Mead not to include any.

Counsel did not so advise Dr. Mead, however, and his report did include background information. Dr. Mead listed four brief opinions:

1) At the time of the commission of the alleged offense, Mr. Jackson was sane.

2) Mr. Jackson is able to understand the nature and purpose of the proceedings against him.

3) He is able to cooperate in a rational manner with counsel in presenting a defense.

4) At the time of the commission of the alleged offense, Mr. Jackson was grossly intoxicated with PCP. He has little recollection of the day's proceedings.

In the remainder of his report, Dr. Mead discussed Jackson's background, including his mother's statement that Jackson began sniffing glue at age 14 and thereafter "became his own worst enemy." He also reported that Jackson "states that he had never shot a shot gun and could not imagine his ever doing so," and that Jackson "wished he could have a Sodium Amytal interview because he held on to the idea that he would not have ever killed anyone." Jackson had had "several 'bad trips' on PCP and remembers at one time feeling that the house was charged with electricity." Jackson was in a fight in the military that resulted in his losing consciousness; he could not remember ever losing consciousness again until the time of the offense. He showed no signs of major mental illness; "[a]ny psychiatric diagnosis would be within the realm of character pathology."

Jackson's counsel decided that several items in the background material would be prejudicial if Dr. Mead testified and the report had to be handed over to the prosecution. Included were the facts that: Jackson had been using PCP regularly, and had had "bad trips," but had not lost consciousness; he had "remembered" a bad trip when he thought the house was

charged with electricity; and that he had come to believe that the police were picking on him. Counsel also feared that the reference to "character pathology" would open the door to other adverse information. Counsel therefore made a motion in limine, asking the trial court to exclude all background matters in the report from being delivered to the prosecution and from being the subject of cross-examination of Dr. Mead. The court denied the motion (at least partly because counsel would not show the report to the prosecution at the time of the motion), and as a consequence counsel elected not to call Dr. Mead.

 Again, counsel's decision would appear to be a judgment call within the range of decisions falling within *Strickland*'s standard of competent counsel. The adverse portions of the report can reasonably be seen as damaging to Jackson. Jackson insists, however, that the ineffectiveness of counsel consists in his not having Dr. Mead limit his report. It is not at all clear, however, that Dr. Mead would thus escape having to respond concerning all of the information that he had used to form his expert opinions. *See* Cal. Evid.Code §§ 801–804.

Nor is it clear that Dr. Mead's favorable testimony would have created a reasonable probability of a different result. On voir dire for the motion in limine, Dr. Mead, after stating that Jackson was "under the influence of PCP at the time he was arrested," responded as follows to Jackson's counsel:

Q: ... Did you also, after taking into consideration your interviews with Mr. Jackson, and the arrest reports, have an opinion as to whether Mr. Jackson, on August 31, 1983, was conscious or basically knew what was going on?

Did he remember the events of August 31, 1983?

A: In my opinion he did not have a full memory of what occurred that day.

Although this testimony would have helped Jackson, it is limited in scope and probable effect. There is no basis for concluding that Dr. Mead would have been more helpful, because he was not a witness in the evidentiary hearing in district court.

The decision not to call Dr. Mead to testify left Jackson without the testimony of any psychiatrist who had examined him—far from a desirable situation when the sole defense concerns Jackson's state of mind. There is an evidentiary problem, however, that overhangs all of counsel's decisions concerning expert testimony. California Penal Code § 29 provides:[5]

In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.

Jackson's counsel believed that section 29 applied to impairment by voluntary intoxication, and would prevent him from eliciting Dr. Mead's (or any other medical expert's) opinion that Jackson in fact had not premeditated. Counsel was not wrong in so concluding. Although the California Supreme Court avoided ruling on the point in *People v. Breaux*, 1 Cal.4th 281, 303, 3 Cal.Rptr.2d 81, 821 P.2d 585, 596 (1991), section 29 since has been interpreted to preclude expert testimony that a defendant in fact did not premeditate. *See People v. Rangel*, 11 Cal.App.4th 291, 302–03, 14 Cal.Rptr.2d 529, 536 (1992). The inability of Dr. Mead to testify directly on premeditation decreased the value of his possible contribution, although he would not

5. Section 29 was originally enacted in 1981 and has undergone minor amendments that do not affect our analysis. *See People v.* *Saille*, 54 Cal.3d 1103, 1111 n. 5, 2 Cal. Rptr.2d 364, 820 P.2d 588, 593 n. 5 (1991).

have been precluded from testifying regarding Jackson's condition at the time of the offense. In all, counsel's decision not to call Dr. Mead was within his permissible realm of professional judgment.

Counsel's means of avoiding the problem posed by Cal.Penal Code § 29 was to rely on hypothetical questions posed to Dr. Aniline, the one medical expert who did testify. Dr. Aniline had not examined Jackson, but was a highly qualified expert on the effects of PCP. He was Ward Chief in Psychiatry at Los Angeles County Medical Center. He had been furnished with the "murder book," toxicological reports, and with daily transcripts of the trial testimony.

Dr. Aniline explained that PCP had once been used as an anesthetic, and that a first-time user with Jackson's blood level of PCP would be unconscious. A chronic user could tolerate much higher levels, but because PCP is stored in the body, a small amount could "set off" a chronic user. Dr. Aniline stressed the unpredictability of the effects of PCP, and testified that PCP intoxication is unique in that it "is very often associated with partial memory states, meaning, that some things are remembered and other things are not, even though an individual may be behaving, let's say in somewhat normal patterns, they can eat, sleep, deal with things socially or go through many known behaviors." Dr. Aniline stated that PCP users may seem to be alert and aware, but "they may not be responding or processing information around them ... the way they would normally.... They are not asleep or comatose. But they are not entirely aware of what is going on around them."

Jackson's counsel asked Dr. Aniline a hypothetical that included virtually all of the evidence of Jackson's actions leading up to and including the shooting and arrest, and Dr. Aniline opined that the person so acting and acted upon was intoxicated by PCP. Then, assuming the same facts, counsel asked Dr. Aniline whether the person involved could deliberate before shooting. Dr. Aniline answered: "I don't know if he deliberated before or not. I think from the information that I have been presented, I would say that some of his ability to think is going to be impaired. And deliberation is part of that.... I think from my point of view in my opinion, there would be impairment of the ability to do that. Whether he did that or not, per se, I can't say."

Dr. Aniline was cross-examined on the fact that he had not interviewed or examined Jackson. Jackson argues here that the failure to arrange such an interview or examination is a failure of effectiveness on the part of his trial counsel.[6] Counsel's original letter to Dr. Aniline, however, told Dr. Aniline that he was not sure whether it would be advantageous to interview Jackson because he does not remember the incident, and that he would appreciate Dr. Aniline's view on the matter.[7] Dr. Aniline did not ask to interview Jackson, perhaps because he assumed that there would be other, examining psychiatrists testifying.

 Counsel is not required to dictate what his experts in their professional judgment need to do to render proper professional services. *See Hendricks v. Calderon*, 70 F.3d 1032, 1038–39 (9th Cir. 1995). Moreover, because experts may not testify directly that a defendant did not premeditate, it was a reasonable professional judgment to choose instead to emphasize the effects of PCP generally on the mental processes. Even if we assume, however, that counsel was ineffective in not having Dr. Aniline examine Jackson, there is not a reasonable probability that

---

6. The State argues that Jackson neither properly exhausted this issue nor raised it in his federal habeas petition. Our disposition of the issue makes it unnecessary for us to address that point.

7. Jackson contends that his counsel instructed Dr. Aniline not to interview Jackson. The district court found to the contrary, however, and that finding is not clearly erroneous.

the result would have been different if the examination had occurred. Dr. Aniline extensively examined Jackson before the evidentiary hearing in district court, and testified to a 95% certainty that he lacked the capacity to deliberate. He also testified that the lack of capacity could have been determined to a 90% degree of certainty at the time of Jackson's trial.[8] But on cross-examination, Dr. Aniline conceded that if Jackson went to the car to get the shotgun, that could be an example of premeditation, and it would be rational to infer so. Similarly with regard to Jackson's putting his head down on the roof of the car and then waiting to shoot until Wrede had relaxed his guard: Dr. Aniline agreed that "[i]f he put his hand [sic] down and therefore maybe even elicited unguarded response and then afterwards, after eliciting the unguarded response, fired, that would show considerable thought." When asked if such behavior would show deliberation, Dr. Aniline answered, "The way we just framed the last sentence, it would." Similarly, he stated that announcing an intention to use a gun showed premeditation. In the light of these and several similar answers, there is no reasonable probability that an examination of Jackson by Dr. Aniline would have changed the outcome of the trial.

We conclude, therefore, that Jackson has failed to show deficient performance and resulting prejudice, within the meaning of *Strickland*, in counsel's preparation and presentation of expert medical testimony in the guilt phase of Jackson's trial.

### 5. *Failure to Interview Witnesses.*

■ Jackson's counsel asked his investigator to interview all of the witnesses who were listed in the murder book. As we have said already, the investigator did not succeed in interviewing many of those witnesses. Jackson complains that it was

ineffective assistance for his counsel to call as defense witnesses persons that he had not interviewed. We assume that it ordinarily falls below the *Strickland* level of required competence to put a witness on the stand without interviewing him. We look then to the question of prejudice.

The instance that Jackson presents as most damaging was his counsel's calling of Adrian Mitchell as the first defense witness. Adrian was 12 years old and his mother had said that he was too upset by the incident for her to allow him to be interviewed. His statement was in the murder book. Counsel on direct examination elicited from Mitchell that Jackson had been acting irrationally just before the encounter with Officer Wrede-that he had been walking erratically, jumping, and diving onto the ground.

On cross-examination and after some disjointed testimony, Mitchell said that he had seen the shooting. Jackson's counsel objected on the ground that the cross-examination was going beyond the scope of the direct examination, but the objection was overruled. Mitchell then testified that, after Jackson got the shotgun, Officer Wrede asked him to put the gun down and Jackson had put it down on the roof. Then Officer Wrede walked around the back of the car, put his gun down on the trunk of the car, and then put his hand up. Jackson then shot the officer. No other witness had testified that Officer Wrede had put his gun down before being shot.

On re-direct examination, Jackson's counsel elicited that Mitchell had not actually heard Officer Wrede ask Jackson to put his gun down; he had merely assumed it. Mitchell also responded that he had told the interviewing officer (who was in the courtroom) what he had just described. Mitchell's statement in the murder book, however, simply stated that Mitchell had shot the officer. Jackson's counsel made

---

8. This evidence of Dr. Aniline was introduced in district court in support of Jackson's free-standing claim of actual innocence, which we discuss later in the opinion. The evidence does suggest, however, the most that could have been gained from an interview with Jackson by Dr. Aniline.

no attempt to impeach Mitchell with the statement.

If Mitchell's account had been the only one in evidence, prejudice might have been established. There were several accounts of the shooting, however. By far the most detailed was that of Rob Dunham, who was stopped in his car 45 feet from the police car at the time of the shooting, with nothing obstructing his view. He testified that, after the officer said something that Dunham could not hear, Jackson put his gun down on the top of the car, but kept his hand on it. He also put his head down, although not down flat on the roof. Officer Wrede then took a step to go around the car, turning his gun away from Jackson. Jackson then picked up the shotgun and shot the officer.

Other witnesses described the shooting in much briefer fashion, but none of them stated that the officer laid his gun down and put up his empty hand. In final argument, the prosecutor mentioned Adrian Mitchell, but argued the facts as presented by Rob Dunham. The prosecutor contended that Jackson chose the moment to shoot the officer because the officer has "got the gun pointed at a different direction than at my head." There is no reasonable probability that the jury relied on Adrian Mitchell's aberrant testimony at all, much less having relied on it to convict when they would not otherwise have done so.

We similarly find no *Strickland* prejudice from testimony of defense witnesses Downs and Shelton, both of whom testified to irrational behavior by Jackson. Downs stated that, when Officer Wrede asked Jackson his name, Jackson answered that it was "none of his fucking business." Shelton testified that Jackson had responded angrily, assuming a karate stance when asked for identification. Neither comment looms large in the trial in light of all of the other evidence of Jackson's irrational behavior and his free use of coarse language. We conclude that there has been no *Strickland* prejudice.

### 6. *Cumulative Ineffectiveness and Prejudice.*

Finally, we reject Jackson's contention that the cumulative effect of his counsel's errors deprived him of effective assistance. In so holding, we consider all of the errors of counsel urged by Jackson, whether we have discussed them or not. Even when they are cumulated, any failures of counsel do not create a reasonable probability that, but for the cumulative effect of the errors, the result would have been different. It is true that counsel's defense in the guilt phase was not highly spirited and focused, but for the most part it did not fall "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. With regard to those actions that we assume were outside the permissible range, there was no showing of prejudice within the *Strickland* standard.

We recognize that premeditation is always arguable when a homicide results from an unplanned encounter involving an accused who was grossly intoxicated. The prosecution, however, presented a persuasive case that Jackson had to reason deliberately in: choosing his first weapon, tree stakes; then pursuing Officer Wrede to his car to select a more destructive weapon; releasing the shotgun's slide action, cocking the weapon and firing it when Officer Wrede had turned aside; threatening other officers with the weapon; and in reaching for another officer's weapon during the arrest struggle. There is not a reasonable probability that, but for counsel's deficiencies, the jury would not have convicted of first-degree murder. We therefore affirm the ruling of the district court upholding Jackson's conviction.

### INEFFECTIVE ASSISTANCE: PENALTY PHASE

Counsel testified in district court that he never expected Jackson's trial to reach the penalty phase, and his preparation reflected that view. The total investi-

gation for purposes of the penalty phase took less than two hours some weeks before the trial began. It consisted of an interview by counsel's investigator with Jackson's mother and his estranged wife. Counsel also spoke briefly to those two witnesses on the day that they testified in the penalty phase. He also reviewed Jackson's juvenile and military records. With that minimal preparation, Jackson's counsel began the first and only penalty phase he had ever tried, only four days after the verdict had been rendered. Counsel testified in district court that he did not ask for a continuance because he had no further investigation to do. In so failing to prepare and investigate for a penalty defense, counsel clearly fell below the requisite standard of competence. *See Williams v. Taylor*, — U.S. —, —, 120 S.Ct. 1495, 1513–1514, 146 L.Ed.2d 389 (2000).

■ The defense case in mitigation consisted of the testimony of Jackson's wife and his mother. His wife testified that she had left Jackson because he was using drugs and couldn't handle it. She stated that Jackson had arranged to take their children to the park later in the day of the shooting. She said that Jackson was a good provider when he was working, and a good husband except for the drug use. He loved and got along well with the children. She related the incident when he believed that the house was charged with electricity. She felt that the verdict was unfair in light of Jackson's intoxication. On cross-examination, she said that she was aware of his dishonorable discharge from the army and his prison term for burglary. On redirect examination, counsel asked if Jackson was a private person. She answered "yes," and added: "he didn't care about other people's problems. He wasn't interested. He wasn't the type of person that would want to know what was going on in somebody else's life. If it didn't have nothing to do with him, then he wasn't concerned about it."

Jackson's mother testified that Jackson's father was a hustler who was not around and did not care about Jackson. Jackson started sniffing glue at age 14, and that is when his problems started. Jackson's mother never had trouble with Jackson in school. He won trophies in sports. She felt that Jackson was sick and she suggested help, but he said nothing was wrong with him. She was shocked at the verdict because the act seemed so clearly drug-related. On cross-examination, Jackson's mother admitted that Jackson had spent his tenth grade in custody because of a robbery. She was also aware of a later burglary where a person with him had a gun.

The testimony of the two defense witnesses covered less than 30 pages of trial transcript. No attempt was made to compile a social history of Jackson, to indicate the conditions in which he had been brought up and lived. There was expert testimony at the evidentiary hearing in district court that a major part of competent counsel's duty at the penalty phase is to prepare and present such a history. Jackson's counsel did not investigate or prepare evidence regarding Jackson's addiction to PCP and the meaning and consequences of such addiction.

■ The defense presented no medical testimony during the penalty phase. Counsel testified in district court that it would not have helped to have Dr. Mead testify that Jackson was grossly intoxicated and had little recollection because "the guilt phase is over." This explanation is wholly insufficient. "Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase." *Hendricks*, 70 F.3d at 1043; *see* Cal.Penal Code § 190.3(k) (trier of fact at penalty phase shall take account of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime").

Certainly one of the primary factors to be considered in mitigation was the clouded mental condition of Jackson caused by drug intoxication. Yet, because of the difficulties Jackson's counsel had with his medical expert testimony in the guilt phase, the jury had never heard from any medical expert who had examined Jackson or who could testify concerning Jackson's actual condition at the time of the crime. One of the constraints operating on counsel in the guilt phase had been Cal.Penal Code § 29, which prevented expert testimony concerning "whether the defendant had or did not have the required mental state[ ] . . . for the crimes charged." But section 29 by its own terms is limited to "the guilt phase of a criminal action." *Id.* It did not constrain such testimony at the penalty phase. In district court counsel stated that at the penalty phase he still found harmful material in Dr. Mead's report, but he could not identify harmful material that was not already available to the prosecution. When he made a motion in limine concerning Dr. Mead's report during the guilt phase, counsel had told the court that Dr. Mead's report contained background information "which basically is going to be used in case we get in a penalty phase" but which is inappropriate for the guilt phase. Then, when counsel got to the penalty phase, he declined to have Dr. Mead testify because of the very material that counsel had earlier said he would introduce at the penalty phase!

Counsel did not compensate for his failure to employ Dr. Mead at the penalty phase by having Dr. Aniline examine Jackson so that he could testify in mitigation. Instead, nothing was done and the penalty phase was left without any expert evidence at all concerning one of the most important factors in mitigation—Jackson's clearly impaired mental condition at the time of the crime.

Counsel did not conduct any investigation at all into an act of aggravation of which he had notice—an alleged sodomy committed by Jackson when he was in the army. Although Jackson told his counsel that the incident had not occurred as reported, counsel did not investigate or interview the victim prior to the victim's testimony in the penalty phase. The testimony left room for argument that the sodomy committed by Jackson had not been committed by force or threat of force, which was a requisite for admissibility. *See* Cal.Penal Code § 190.3. Yet Jackson's counsel made no motion in limine, and no objection to the testimony.

We have no doubt that counsel's deficiencies at the penalty phase were prejudicial. The declaration of Dr. Jackman in the district court indicates some of the mitigating matter that could and should have been presented as a part of Jackson's social history. It recites that Jackson suffered repeated beatings in childhood, and that his mother choked him when angry with him. Jackson's childhood and adolescence were characterized by neglect and instability. It notes that Jackson exhibited signs of mental illness in childhood and was diagnosed at one time as schizophrenic. In all, Dr. Jackman's report presents a very different picture of Jackson than any the jury was allowed to consider.

We conclude that the utter failure to present medical evidence was prejudicial as well. *See Bean v. Calderon,* 163 F.3d 1073, 1080–81 (9th Cir.1998) (presentation of medical experts without preparation and foundation prejudicial at penalty phase), *cert. denied,* —— U.S. ——, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999). Dr. Mead's report indicates that he was prepared to testify that Jackson could remember little of the incident. Dr. Aniline, whose testimony in the district court was introduced as part of the "actual innocence" claim that we discuss below, testified that it could have been established to a 90% medical certainty in 1983 that Jackson was unable to think consciously at the time of the crime. Certainly medical testimony would have been available that Jackson's ability to think was grossly impaired.

The State argues that some of the evidence now relied on by Jackson cannot be accepted at face value, that declarations of family members controvert some of the family history that Jackson contends should have been presented. The State is correct that, because Dr. Jackman did not testify, the State has not had a chance to test his statement by cross-examination. *See Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000). But Jackson's mother in her deposition admitted hitting Jackson with "whatever I had in my hand," and that she choked him more than five but less than ten times. She said she did not choke him into unconsciousness, but that "His head is bobbing. I thought a couple of times maybe his tongue was out, and that is when I would have stopped." This evidence, alone, presents a very different picture from her testimony at the penalty phase. And with medical evidence, the jury would have been presented with a different medical picture of Jackson's state of consciousness than the one they received, which was no picture at all. Dr. Aniline presented evidence in district court indicating the kind of testimony available, and the State had the opportunity to cross-examine him. In sum, the evidence produced at the evidentiary hearing convinces us that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the [penalty] proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In other words, the probability of a different result is "sufficient to undermine confidence in the outcome." *Id.* That probability of a different result establishes Jackson's right to relief. *See Williams v. Taylor*, —— U.S. ——, —— - ——, 120 S.Ct. 1495, 1512–13, 146 L.Ed.2d 389.

It is true that there was evidence of premeditation, in the guilt phase, that the jury could consider in the penalty phase. But the evidence was far from overwhelming; this is one highly unusual murder in the first degree, with an unplanned encounter between a grossly intoxicated, originally unarmed defendant and a victim suddenly ending in death. In determining the degree to which the lack of medical evidence of Jackson's actual impairment and the lack of a social history prejudiced Jackson, we keep in mind the admonition of *Hendricks:*

> The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability. Presumably the imposition of a death sentence is entrusted to a jury because it is a uniquely moral decision in which bright line rules have a limited place. In light of the whole record, and despite the substantial evidence of aggravation, we conclude that the failure of [counsel] to present mitigating evidence rendered the sentencing hearing neither fair nor reliable.

*Hendricks*, 70 F.3d at 1044; *see also Williams v. Taylor*, —— U.S. at ——, 120 S.Ct. at 1513–14 (evidence of lack of premeditation may affect jury's selection of penalty even if it does not undermine death-eligibility). As in *Hendricks*, we conclude that counsel's failure rendered the verdict of death unreliable, and that the writ must issue invalidating that sentence.

## FREE–STANDING CLAIM OF FACTUAL INNOCENCE

 Much of the testimony and argument in the district court was directed toward establishing a "free-standing" claim of "actual innocence" for Jackson. The State contends that actual innocence is not a permissible ground for issuing a writ of habeas corpus, citing the discussion in *Herrera v. Collins*, 506 U.S. 390, 398–408, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). The majority opinion in *Herrera*, however, assumed for purposes of decision that "a

truly persuasive" demonstration of actual innocence would render the execution of a defendant unconstitutional, but that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* at 417, 113 S.Ct. 853. As we have noted, however, a majority of the Justices in *Herrera* would have supported a claim of free-standing actual innocence. *See Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997), *cert. denied,* 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998). We also held that "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.*

▪ The petitioner in *Carriger* contended, however, that he had not committed any crime against the victim; Jackson contends only that he could not have premeditated or specifically intended to kill Officer Wrede. Even if we assume, without deciding, that a free-standing claim of innocence may be maintained in such circumstances, we conclude that Jackson has not made the necessary showing. Jackson has certainly cast doubt on his conviction by Dr. Aniline's testimony that, to a 95% medical certainty, Jackson could not have premeditated or specifically intended to kill. But other testimony of Dr. Aniline, both at trial and in the evidentiary hearing, shows that the effects of PCP on any particular user are unpredictable, that the effects wax and wane during intoxication, and that rational persons could interpret some of Jackson's actions (described above in our discussion of the guilt phase) as showing premeditation. Dr. Baselt testified at the evidentiary hearing that a person with a level of 176 nanograms per milliliter of blood would not necessarily be unable to process thought, premeditate, deliberate and intend to kill. Dr. Aniline's testimony, considered in full, does not directly counter or qualify this conclusion. There is no showing that a court-appointed

neurologist would be able to eliminate the effect of Dr. Baselt's testimony, and the district court consequently did not abuse its discretion in failing to appoint such a neurologist. *See United States v. Nelson,* 137 F.3d 1094, 1101 n. 2 (9th Cir.) (denial of appointment of expert reviewed for abuse of discretion), *cert. denied,* 525 U.S. 901, 119 S.Ct. 232, 142 L.Ed.2d 190 (1998).

▪ The positron emission tomography (PET scan) evidence also provides little support for Jackson's claim. The State's expert testified at the hearing that the use of PET scans to diagnose chronic PCP abuse is not generally accepted by the scientific community, and this testimony was not refuted. The district court was accordingly entitled to disregard the evidence.[9] *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In addition, Jackson's PET scan is susceptible to conflicting interpretations, and its importance is unclear. No evidence was introduced that the PET scan proves that Jackson was unable to premeditate or form a specific intent at the time of the shooting. The PET scan evidence could, at best, only establish that Jackson suffered some PCP-induced brain abnormality, the effect of which on Jackson's capacity for higher thought is not demonstrated. The PET scan, by itself or in combination with the other evidence offered by Jackson, fails to make the required showing of probable innocence, which "contemplates a stronger showing than insufficiency of the evidence to convict." *Carriger,* 132 F.3d at 476. Jackson's free-standing claim of actual innocence consequently fails.

## CONCLUSION

Jackson has failed to demonstrate that he was prejudiced by ineffective assistance of counsel at the guilt phase of his trial. We therefore affirm the district court's denial of a writ of habeas corpus to over-

---

**9.** We find no abuse of discretion by the district court in refusing to allow Dr. Buchsb-aum to testify in rebuttal on the PET scan issue.

turn his conviction. We also affirm the district court's rejection of Jackson's free-standing claim of actual innocence.

We conclude, however, that Jackson has demonstrated ineffective assistance of counsel at the penalty phase of his trial, and has shown that counsel's ineffectiveness created a reasonable probability that, but for counsel's errors, the death penalty would not have been imposed. We accordingly reverse the district court's denial of a writ of habeas corpus with regard to the penalty, and we remand this matter to the district court with instructions to issue a writ invalidating Jackson's death penalty as now imposed.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED with instructions.**

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's affirmance of Jackson's conviction for first degree murder. I also concur in the court's denial of Jackson's actual innocence claim. The court's reliance on speculation regarding the effect of additional evidence to over-turn Jackson's sentence, however, forces me to dissent from that portion of its opinion.

I

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court instructed us on how to evaluate claims of ineffective assistance of counsel. Although the majority follows *Strickland*'s analytical framework, it fails to apply its command that "every effort be made to eliminate the distorting effects of hindsight" and that our review of the decisions of trial counsel be "highly deferential." *Id.* at 689, 104 S.Ct. 2052. Only by doing so can we remain true to the Court's

teaching that in order to set aside his sentence Jackson must show that his trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052.

The majority takes Jackson's trial counsel to task for the following sins of omission. First, the majority chides counsel for not introducing evidence regarding Jackson's childhood experience of beatings, neglect and possible mental illness. Second, the majority asserts that at the penalty stage, trial counsel's failure to introduce evidence regarding the effects of phency-clidine (PCP) on Jackson's ability to reason and premeditate prejudiced Jackson. We may not overturn his sentence, however, unless his counsel's representation fell outside of "the wide range of reasonable conduct" and unless any errors created the "reasonable probability of a different result." *Id.* at 694, 104 S.Ct. 2052. At best, Jackson's arguments convince me only that the additional evidence might have had "some conceivable effect of the outcome of the proceeding," a standard which the Court expressly held, "is not enough." *Id.* at 693, 104 S.Ct. 2052.[1]

II

The majority contends first that trial counsel did not present adequate evidence of Jackson's social history. Specifically, the majority points to evidence that Jackson suffered repeated beatings as a child, that his mother choked him several times, that his childhood was characterized by neglect and instability, and that Jackson exhibited signs of mental illness in child-hood and was diagnosed at one time as schizophrenic.

The majority relies on representations in the declarations of various family mem-

---

1. The majority also alleges other errors by trial counsel-the length of the investigation and failure to investigate the circumstances surrounding the sodomy Jackson committed while in the military. The majority's failure

to explain how these actions prejudiced Jackson renders these arguments little more than makeweight. If Jackson cannot show prejudice, he has not established a violation of his right to counsel.

bers and friends. These individuals did not testify at the evidentiary hearing before the district court, and the State was thus deprived of its opportunity to cross-examine them. Apparently the majority is little bothered by the lack of cross examination, the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In addition, those declarations were controverted by the declarations of others who asserted that they had never witnessed any abuse and that Jackson had been a happy child.

## A

Putting that troubling matter aside, the majority stunningly asserts that it is enough that Jackson's mother had stated in her deposition, but did not testify at trial, that she hit Jackson and choked him five to ten times. At the penalty phase of the trial, the jury heard from Jackson's mother who testified that his father was "a hustler, gambler, a street person," who was never around and did not care about his son. Trial counsel's decision not to introduce additional evidence of his mother's disciplining him was not "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. In fact, it might have undermined her role at the penalty stage as a sympathetic mother pleading for mercy for her son.

If there were additional evidence of abuse, trial counsel cannot be faulted for failing to churn it up. "[T]he 'reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.' " *Langford v. Day*, 110 F.3d 1380, 1386–87 (9th Cir.1996) (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052). Today, Jackson appears more than willing to help his attorneys prepare for his defense, but in order to eliminate the distorting effects of hindsight, we must look at the reasonableness of counsel's conduct in light of the information he knew at the time of trial. When counsel interviewed Jackson at that time, Jackson gave him no leads at all. He pointed him only to his mother and wife, whom trial counsel did interview. Although now Jackson and the majority fault counsel for not putting forth additional proof of a difficult childhood, at the time, Jackson gave him no indication that his youth had been marred by beatings and neglect. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). In addition, when interviewed Jackson's wife reported that Jackson and his mother had a good, affectionate relationship. She stated Jackson had never told her that he felt he had been abused as a child, or even complained about his childhood. Counsel had little reason to search out evidence of abuse.

Even assuming error in trial counsel's decision not to put forth more evidence of harsh discipline, there is no reasonable probability that evidence of several chokings and beatings during childhood would have swayed the jury. When Jackson's attorney interviewed his wife, she reported to him that her husband had a close relationship with his mother. This would have cast doubt on the significance of any lasting impact of the beatings and their now purported effect on his murder of the police officer. The jury had already decided that Jackson had deliberately murdered a police officer, they knew that Jackson had been abandoned by his father, but they also knew he had a good relationship with his mother. Only by sheer speculation can the majority conclude that evidence that his mother disciplined him by hitting him would have changed the jury's verdict.

## B

As for the evidence that Jackson may have shown signs of mental illness as a

youth, trial counsel had Jackson evaluated by two doctors who stated that he did not show any signs of mental illness at the time of trial. The two electroencephalograms showed no abnormalities. An attorney may reasonably rely on the reports of expert witnesses whom he hires to advise him. *See Morgan v. Bunnell*, 24 F.3d 49, 52 (9th Cir.1994). In determining whether Jackson's counsel acted within the wide range of professional judgment, we must focus on the reasonableness of the attorney's actions in light of what he was told by the experts. An attorney who hires two expert psychologists who in turn inform him that his client suffers from no mental illness acts reasonably when he does not pursue evidence that his client may have exhibited signs of mental illness as a child, particularly when the only indication of this was a juvenile record from thirteen years earlier.

Jackson has also failed to show prejudice. Considering the two expert conclusions of no mental illness, a report from when Jackson was sixteen revealing that he had been expected to develop stronger schizophrenic tendencies had no "reasonable probability" of changing the outcome of the sentencing proceeding.

### III

The next category of evidence the majority faults trial counsel for not introducing is that dealing with the effects of PCP on Jackson's ability to premeditate. The majority concludes that trial counsel should have had Dr. Mead or another expert testify that Jackson was grossly intoxicated at the time of the murder and had little recollection of the events. The trial record demonstrates, however, that such additional testimony as the majority demands had little chance of affecting the decision of the jury, which already had before it evidence both of Jackson's PCP intoxication and of the effects of PCP.

Medical evidence during the guilt phase of the trial established the high level of PCP in Jackson's blood, as well as the presence of amphetamines and cocaine in his urine. The level of PCP was so high that according to defense expert, Dr. Aniline, it would render a first-time user unconscious. Jackson admitted he was a chronic user of PCP and had used PCP the day of the murder. Dr. Aniline testified further that Jackson's behavior at the time of the crime corresponded with PCP intoxication. Thus the jury knew that Jackson was high on PCP when he murdered the police officer.

The jury also heard at the guilt phase from Dr. Aniline that the effects of PCP are unpredictable, that individuals intoxicated with PCP remember only some things that happen during their high, and that even though they appear alert, they are not in fact entirely aware of what is happening and may not be processing information the way they normally would be. Finally and importantly, Dr. Aniline told the jury that a PCP user in Jackson's state of intoxication would have an impaired ability to think and deliberate, though he could not conclude for certain whether or not Jackson had deliberated. As the district court found, all of this evidence was consistent with trial counsel's strategy to explain how Jackson could have taken the actions he did and still be so intoxicated that his ability to think was impaired. Thus the jury had before it substantial evidence of the effects of PCP on a user's ability to think.

Even if trial counsel were unconstitutionally ineffective for not using an expert witness who had examined Jackson at the penalty stage to testify to Jackson's impaired ability to think, this would not have had a "reasonable probability" of producing a different sentencing outcome. At the penalty phase, the jury may consider all evidence presented at the guilt phase. *See People v. Cummings*, 4 Cal.4th 1233, 1330, 18 Cal.Rptr.2d 796, 850 P.2d 1 (1993) (In Bank). The jury that sentenced Jackson knew that PCP greatly impairs a user's mental condition and knew that Jackson was high on PCP at the time of

the crime. Yet, it sentenced him to death. I simply cannot say that there is a reasonable probability that a jury knowing those facts would have come out differently if only an expert had put two and two together. The jurors were quite capable of doing this themselves. Moreover, whatever additional evidence of PCP's effect on the ability to deliberate Jackson's counsel introduced, the jury had before it other evidence of premeditation. Jackson went to the police car, opened the door, grabbed the shotgun, and cocked the gun. There was also evidence that Jackson intentionally caused the officer to drop his guard before shooting him to death.[2] Because of this evidence of premeditation and because the jury effectively had before it the evidence the majority wishes trial counsel had introduced, I cannot conclude that but for counsel's decisions not to introduce the evidence there is a "reasonable probability" that the jury would have given a different sentence.

The evidence demonstrates that the jury was well aware that Jackson's ability to think clearly may well have been impaired when he shot the police officer, but still imposed the death sentence. The majority speculates when it concludes that if an expert who examined Jackson weeks after the murder had told the jurors that Jackson's ability to think at the time of the crime was impaired, there is a reasonable probability that they would not have imposed the death sentence. Perhaps the majority is inclined to the view that Jackson should not have received the death penalty: "[T]he evidence [of premeditation] was far from overwhelming; this is one highly unusual murder in the first degree, with an unplanned encounter between a grossly intoxicated, originally unarmed defendant suddenly ending in death." Supra at 1164. For me, the point is that the jury knew all of that and still sentenced Jackson to death. I cannot

usurp the role of the jury in determining the appropriate punishment by supplanting its judgment with my own.

## IV

A sentence of death should not be imposed lightly nor without due consideration of all relevant factors. Nor should a federal court of appeals lightly overturn the sentence given by the jury, as well as the reasoned determinations of two state courts and a federal district judge, all of whom affirmed the sentence. Trial counsel's decisions fell well within the wide range of professional conduct and there is no "reasonable probability" that any errors he may have made affected the outcome of the proceeding. Thus, I must dissent from that portion of the opinion vacating Jackson's capital sentence.

---

**2.** At the evidentiary hearing before the district court, Dr. Aniline himself testified that these and other actions by Jackson show deliberation and premeditation.