[No. A052574. First Dist., Div. Two. Nov. 6, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGELIO HAMILTON RANGEL, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of part I, footnote 3, and footnote 5.

**Counsel**

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Jana J. Clark, Deputy State Public Defender, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Stan M. Helfman, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

### KLINE, P. J.—

*Introduction*

Rogelio Hamilton Rangel appeals his conviction, following a jury trial, of the first degree murder of Sandra Flores (Pen. Code, § 187)[1] and of the attempted voluntary manslaughter of Maria Reynaga (§§ 664, 192, subd. (a)). The jury further found as to each offense that appellant personally used a firearm within the meaning of section 12022.5, subdivision (a), and that he inflicted great bodily injury upon Reynaga (§ 12022.7). He was sentenced to an indeterminate term of 25 years to life for first degree murder, plus 4 years for the firearm use allegation. The court also imposed a concurrent term of nine years for the attempted voluntary manslaughter and enhancements.

Appellant contends reversal is required as (1) the trial court failed to instruct the jury sua sponte that evidence of an oral admission should be viewed with caution and (2) appellant was denied due process by the trial court's erroneous exclusion of the opinion of his expert witness as to whether appellant actually formed the intent to kill.

*Statement of Facts/Statement of the Case*

On April 8, 1990, appellant, a 67-year-old man, shot and killed his 26-year-old former girlfriend, Sandra Flores, and seriously wounded Flores's roommate, Maria Reynaga. The issue at trial was appellant's state of mind at the time. In June 1987, appellant, who had been married to someone else for 40 years, met and fell in love with Flores, who was separated from her husband. Appellant would visit Flores weekly. Their relationship was sexual. He had visited Reynaga and Flores's apartment many times. Reynaga described appellant as a kind man who would buy presents for her children. Appellant claimed he had spent several thousand dollars on Flores, including paying the costs of legal fees she incurred in securing an employment authorization card.

Flores had met another man, Jose Luis Cruz, and had broken off her relationship with appellant sometime around October 1989. Appellant still telephoned the Reynaga household and visited occasionally. Appellant claimed that he did not know that Flores no longer wanted to date him. In December 1989, appellant, Flores, Reynaga and Reynaga's husband and children went to Reno for a brief holiday. They travelled in appellant's car.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Flores and appellant shared a separate hotel room and appellant paid all the basic expenses for the group.

On April 7, 1990, the day before the shootings, appellant went to the shop of Miguel Ramos to ask him to work on his brother-in-law's car. As he arrived, he saw Flores and Reynaga trying to avoid detection by hiding under the dashboard of a car parked at the shop. Because appellant knew the car belonged to a man, he suspected Flores was trying to hide the fact that she was dating other people. Appellant became upset and felt betrayed. Upon returning to his home in Santa Clara, appellant began drinking heavily. He also took medication that had been prescribed after his heart bypass operation.

The following morning, appellant continued to drink, becoming very drunk. He continued drinking throughout the day. While driving around in his truck, appellant thought about wanting to talk with Flores about dating other people. Upon arrival in San Francisco, appellant went to the Muchacho Allegre bar where he spent a few hours drinking. He claimed that he was approached and informed that two ladies wanted to see him outside. On the street in front of the bar he saw Flores and Reynaga in a car. He recalled that Flores ignored his attempts to speak to her. Reynaga testified that she and Flores were sitting at a stop sign at the intersection across from the bar when they saw appellant coming out of the bar. Appellant was drunk and made an attempt to speak with Flores. As Flores turned her face from him, he said, "We'll see each other." He did not seem to be in a particularly bad mood. Appellant recalled that the pair laughed at him as they drove away. Appellant continued drinking, consuming between 10 to 15 beers while thinking about Flores and his desire to spend the night with her.

Around 11 p.m., after Flores and Reynaga had gone to bed, Reynaga heard the sound of a car horn outside. That was how appellant customarily announced his presence. Reynaga looked out the living room window and saw appellant and his truck. She called down to appellant, asking what he wanted. He did not reply. Flores also looked out the window, but did not speak. She told Reynaga not to let appellant in. Shortly thereafter, appellant, who had somehow entered through the downstairs security gate, knocked at the front door. Reynaga admitted him. He was carrying a bag and asked to use the bathroom. Reynaga did not expect trouble and permitted him to do so.

Reynaga's oldest daughter, Marlene, was talking on the telephone in the living room. She testified that appellant stopped briefly in the living room and stared at her, "sort of like funny," before entering the bedroom. Reynaga

went back to bed. Flores had remained in the bed, completely under the blankets. Reynaga's younger daughter, Maritza, was sleeping on a mattress on the floor in the same bedroom. Appellant entered the bedroom, saying, "Where is my love?" Reynaga said, "We are here." Flores, upon hearing appellant enter the apartment, had buried herself beneath the covers. Appellant went back to the bathroom. He returned, said "You no shop," pulled a gun from his waist and started shooting. He was not shooting in any particular direction, but waved the gun from right to left. Reynaga had never seen him in possession of a handgun before. The first two shots hit Reynaga. One shot entered her left breast and exited her back, the second, inflicted as she was trying to escape from the room, entered her left elbow and travelled up her arm. Reynaga told Marlene to get off the phone and call the police. Reynaga heard additional shots and went back to the bedroom to help Flores. Appellant was shooting Flores, who was on the floor. Reynaga pleaded with appellant to leave Flores alone. Appellant turned to Reynaga, aimed the gun at her, and said, "I am also going to kill you." Reynaga grabbed the gun from appellant. Appellant left the apartment, walking "very loose, very drunk." Flores dragged herself into the hallway of the apartment, where she collapsed.

Appellant was apprehended as he walked away from the apartment in the general direction of the Muchacho Allegre bar. He stopped when ordered and did not attempt to flee. Appellant had a blood-alcohol level of .19 percent, when drawn at 2:50 a.m. If appellant's last drink was at 11 p.m., his blood-alcohol level would probably have peaked at .24 somewhere around midnight and would have been between .21 and .22 at the time of the shooting. Toxicologist Michael Slade testified that at that level of intoxication, a person would have mental and physical impairment to the degree that they would misunderstand their environment, have a distorted picture of reality and, in particular, misunderstand the truthful nature of incoming stimuli. Appellant's blood was not tested for the presence of the particular prescription drugs appellant claimed to have taken.

Appellant could recall little about the events surrounding and including the shootings. He could not remember leaving the bar, driving to the apartment, parking his car, or honking the horn. He did recall that Reynaga's daughter was at the door of the apartment and that he went into the bedroom. When he entered the bedroom, he saw bodies moving under the blankets of the bed, which he assumed to be the bodies of Flores and Jose Luis Cruz "having sex or something." He knew it was Flores because he could see her face beneath the covers. Appellant "exploded" and "freaked out." He recalled nothing else until he was arrested. He did not recall firing the gun or telling Reynaga, "I am going to kill you too."

## I.*

. . . . . . . . . . . . . . . . . . . . . . . .

## II.

Appellant contends the trial court's rulings excluding opinion testimony of his expert witness deprived appellant of his due process right to require the People to prove every element of the charged offense and of a meaningful opportunity to present a complete defense. We disagree.

By its challenged rulings, the court initially limited expert opinion regarding the effects of alcohol ingestion on appellant's mental state and subsequently struck expert opinion as to whether appellant had the specific mental states required for first degree murder. The relevant facts follow.

### A. *Evidentiary rulings.*

The defense sought to show that appellant was not guilty of murder, but only of manslaughter. To support this defense, appellant offered the opinion of Dr. Fred Rosenthal, a physician specializing in forensic psychiatry, on the issue of whether appellant actually formed a specific intent to kill. Rosenthal testified that it was common for a patient to experience depressive episodes following bypass surgery, such as appellant's. In response to a defense hypothetical, Rosenthal testified that in his opinion, appellant, a 67-year-old man who had a blood-alcohol content between .22 percent and .25 percent, who had also undergone two bypass surgeries and who was in love with a 26-year-old woman whom he believed to be in bed with another man, "just lost control and became enraged and reacted in a terribly horrible fashion." Rosenthal opined that at the moment of the shooting appellant was governed by an impulse, explaining "if you take the alcohol level and the effects that you know that alcohol produces on people, the extreme irritability, the belligerence that occurs with alcohol intoxication, the inability to perceive clearly, the surroundings. People who are drunk to that extent often misperceive very easily even in a lighted place, but if it's dark, it's even more likely. And then they become—their emotions are completely out of control. They react impulsively in that state of intoxication. And I think everything about this situation is consistent with that interpretation."

Defense counsel then asked Rosenthal whether he had an opinion whether appellant actually premeditated, deliberated or actually formed malice aforethought before he shot Flores. The prosecutor objected that the issue was for

*See footnote, *ante*, page 291.

the jury. An in camera hearing was held to explore the basis for Rosenthal's opinion. At that time Rosenthal opined that appellant did not actually premeditate or deliberate before killing Flores. He explained the basis for his opinion as "in that state of intoxication, the person is not able to think rationally and deliberate, which means weigh consequences, think about things in logical sequences. And for that reason, I think in that state of mind the person is not able to do that, and therefore I would say he could not do that." The court asked whether the basis for the conclusion was Rosenthal's belief that appellant "did not have the capacity to form the intent to deliberate?" Rosenthal responded, "Well, that would be what I would say; with that state of mind, you don't have that capacity." At that point, the court stated it could not allow the testimony as it was based upon appellant's capacity. Rosenthal then sought to clarify his opinion, stating that two different questions were involved: appellant's actual intent and his capacity to form intent. Under further questioning, Rosenthal admitted that his conclusion that appellant did not premeditate was based in part on appellant's incapacity to premeditate because of his alcoholic condition. Rosenthal also stated his opinion that even apart from appellant's alcohol consumption, appellant did not premeditate and did not intend to kill Flores.

The court then ruled that Rosenthal could "testify as to the defendant's lack of premeditation, lack of deliberation and lack of specific intent to produce the death of Flores by shooting her, but no part of that hypothetical question can include the fact of alcohol ingestion." When questioned, the court clarified that its ruling was based upon the court's understanding that the reason Rosenthal came to the conclusion that appellant did not actually have the requisite mental states was because he was incapable under the circumstances. Rosenthal again attempted to clarify that actual intent and capacity were two different, though interrelated questions and that he did not see how alcohol ingestion could be ignored. Defense counsel stated he would abide by the court's ruling and make no reference to alcohol intake in his hypothetical. The court also stated that "the jury can listen to the testimony of other witnesses and this such as Dr. Slade, who testified that in his opinion the alcohol affected the judgment of the defendant, and in his opinion could have created the illusion of action or hallucination, so therefore the alcohol testimony stays in because it's relevant to that testimony."

Thereafter, in front of the jury, Rosenthal testified to his opinion that, excluding the effect of alcohol ingestion by appellant, appellant did not premeditate, deliberate, or intend to kill Flores. He explained his opinion as being based upon the "circumstances of the way the crimes occurred . . . ." In sum, he explained that the circumstances suggested that the shootings and appellant's actions leading up to the shootings were haphazard, impulsive,

almost accidental acts and indicated a lack of reasoning or clear conscious thinking by appellant.[3]

The next morning, the court struck Rosenthal's testimony "as to whether defendant did nor did not have the mental states of deliberation, premeditation or intent to kill Sandra Flores." The court explained that further research had shown that expert testimony was not admissible as to whether the defendant had or did not have the required mental states of deliberation, premeditation or specific intent to kill. "That is a question for the trier of fact, you, the jury." The court instructed the jury to disregard the stricken testimony, but also advised the jury, "This instruction does not prevent you from consideration of evidence of voluntary intoxication on the issue of whether or not defendant actually formed a required mental state such as specific intent, deliberation, premeditation, or harbored malice aforethought to kill Sandra Flores. You may consider such evidence on that issue. What you may not consider are the opinions of Dr. Rosenthal as I have just explained to you."

### B. *Rosenthal's testimony under cross-examination.*

Cross-examination of Rosenthal by the prosecution was resumed. The *prosecution* proceeded to elicit from Rosenthal, at great length, his opinions as to the effects of alcohol upon appellant's mental state.[4] In sum, Rosenthal testified that in his opinion, in the circumstances of the case, and especially at appellant's level of intoxication, appellant's thoughts were scattered and erratic; he was motivated by impulse. Rosenthal explained that he believed appellant's thinking was motivated by impulse because "in a state of intoxication as he was in, what you get is impulsive behavior. You don't get thoughtful, deliberate behavior, you get impulse reactions, overreactions, distorted kind of behavior." Rosenthal also opined that at such a level of intoxication, appellant "would not be thinking about his behavior and then acting. He would be more or less just doing things on an impulsive, routine manner." "He was probably just acting in a routine, automatic sort of fashion without thinking about his behavior."

### C. *Limitation of expert testimony regarding effects of alcohol ingestion.*

■ Appellant first contends the court erred in limiting Rosenthal's expert opinion to exclude the effects of voluntary intoxication on appellant's actual mental state.

---

[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

*See footnote, *ante*, page 291.

[4] Why the prosecution should elicit this testimony, which had previously been limited, remains a mystery. Perhaps the best explanation is the prosecutor's acknowledgement that this was his first murder trial.

"Section 28, subdivision (a) provides in pertinent part that evidence of mental illness 'shall not be admitted to show or negate the *capacity* to form any mental state,' but is 'admissible solely on the issue of whether or not the accused *actually formed* a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.' (Italics added.)" (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1111-1112 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

Insofar as Rosenthal testified at the in camera hearing that his opinion regarding appellant's actual mental state was premised upon his opinion that appellant lacked the *capacity* to form the mental state due to the level of his intoxication, the court correctly ruled such testimony inadmissible under sections 25 and 28. To the extent Rosenthal could have testified to the effects of alcohol intake on appellant's actual mental state without reference to his capacity to form said mental state, any error was necessarily harmless given Rosenthal's extensive testimony on this subject elicited by the prosecutor on cross examination.

D. *Striking expert opinion that appellant did not deliberate, premeditate or intend to kill.*

█ Appellant next contends that the court denied him due process when it struck Rosenthal's opinion that appellant did not deliberate, premeditate, or harbor the requisite specific intent to kill. We disagree.

Section 29 provides in its entirety:

"In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Appellant argues that section 29 does not exclude expert testimony as to the effect of voluntary intoxication upon his mental state. We disagree.[5]

In *People* v. *Saille, supra,* 54 Cal.3d 1103, 1109-1117, wherein the defendant presented evidence that he was intoxicated at the time of the crimes, the California Supreme Court reviewed the historical development of the doctrine of diminished capacity and its abolition.

---

[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

*See footnote, *ante,* page 291.

"Senate Bill No. 54 added to the Penal Code sections 28 and 29, which abolished diminished capacity and limited psychiatric testimony. It amended section 22 on the admissibility of evidence of voluntary intoxication, section 188 on the definition of malice aforethought, and section 189 on the definition of premeditation and deliberation." (54 Cal.3d at p. 1111, fn. omitted.)

"A provision abolishing the defense of diminished capacity was also included in the initiative measure adopted in June 1982 and known as Proposition 8. Section 25 was added to the Penal Code as part of Proposition 8. Subdivision (a) of section 25 provides: 'The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.' " (54 Cal.3d at p. 1112.)

In a broad statement which would appear to dispose of appellant's contention that voluntary intoxication was excluded from section 29, the Supreme Court observed: "Section 29 provides that *any expert* testifying in the guilt phase of a criminal action 'shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.' " (*Saille, supra,* 54 Cal.3d at p. 1112, italics added.)

However, in *People* v *Breaux* (1991) 1 Cal.4th 281 [3 Cal.Rptr.2d 81, 821 P.2d 585], decided 18 days after *Saille,* the Supreme Court indicated it was reserving judgment on the scope of section 29. In *Breaux,* the trial court ruled that it would not permit testimony of a defense expert as to whether the defendant had premeditated and deliberated at the time of the killing, indicating section 29 precluded such testimony. On appeal, the defendant argued that section 29 did not apply "because the testimony of the psychiatrist had nothing to do with 'defendant's mental illness, mental disorder, or mental defect.' Rather, the psychiatrist was prepared to testify only to the effect of drug usage, sleep deprivation, and rage on defendant's mental state." (1 Cal.4th at p. 303.) The Supreme Court found no interference with the defendant's rights to present a defense and to due process, as the psychiatrist testified fully about these issues. (*Ibid.*) The court expressly reserved decision on the applicability of section 29. "*Without deciding whether the psychiatrist's testimony fell within the proscription of section 29,* we merely note that he did testify about the symptoms of psychosis due to

cocaine and stated that defendant had those symptoms; he described the disorganizing effects of defendant's cocaine use and sleep deprivation and the resulting paranoia, explosiveness, and anger. He testified fully as to his opinion of defendant's condition before and at the time of the murder. He stated that defendant's mental state was inconsistent with premeditation. He opined that defendant could not and did not premeditate the shooting. In his opinion, defendant shot the victim while in an 'enraged' state, and the doctor equated rage with lack of intent." (1 Cal.4th at p. 303.)

Although the court found it unnecessary to resolve the issue in *Breaux*, its discussion in *Saille* strongly supports reading section 29 to apply to expert testimony encompassing the effects of voluntary intoxication. Recently, the Court of Appeal in *People v. Jarmon* (1992) 2 Cal.App.4th 1345 [4 Cal.Rptr.2d 9], rejected the defendant's claim that counsel was incompetent for failing to introduce available expert evidence that he lacked capacity to harbor malice due to his ingestion of drugs and alcohol. Observing that the defendant's alleged lack of capacity to harbor malice was irrelevant under section 28, the appellate court stated, "Pursuant to Penal Code section 29, the expert's opinion as to whether he actually harbored malice was inadmissible." (2 Cal.App.4th at p. 1352, fn. omitted.) In this, *Jarmon* echoes the conclusion of *People v. Lynn* (1984) 159 Cal.App.3d 715 [206 Cal.Rptr. 181], that in a case involving drug and alcohol ingestion, the "trial court properly ruled under section 29 the defense expert could not testify on whether he premeditated and deliberated." (*Id.*, at p. 733.)

We believe the language of section 29 is susceptible to an interpretation including the effects of voluntary intoxication on the mental processes. As remarked in *People v. Spurlin* (1984) 156 Cal.App.3d 119 [202 Cal.Rptr. 663], " '[m]ental incapacitation' has been liberally construed to include such things as 'voluntary intoxication' [citation]." (*Id.*, at p. 127.)

Moreover, neither section 28 nor section 29 refers to intoxication or voluntary intoxication. Section 28 makes evidence of "mental disease, mental defect, or mental disorder" inadmissible to show or negate capacity to form any mental state, and limits the admissibility of such evidence to the issue of actual intent, premeditation, deliberation or malice. In virtually identical terms, section 29 precludes an expert testifying about the defendant's "mental illness, mental disorder, or mental defect" from testifying on the ultimate issue of whether the defendant had or did not have the required mental states. Section 28 and section 25, which refers to "evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect," are viewed as complementary. It is not reasonable to conclude that evidence of voluntary intoxication would be inadmissible to show or to

negate capacity under section 28, but that an expert testifying about the effects of defendant's voluntary intoxication would not be precluded by the virtually identical language of section 29 from rendering an opinion on the ultimate issue of whether the defendant premeditated, deliberated or harbored the requisite intent.

■ Finally, even if section 29 did not support exclusion of the stricken testimony, the error in striking this ultimate opinion testimony would necessarily be harmless here. Due process guarantees the defendant the right to require the prosecution to prove every element necessary to sustain the conviction for the charged offense. (*Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 702-704 [44 L.Ed.2d 508, 521-523, 95 S.Ct. 1881].) The extensive testimony of Rosenthal as to the effects of alcohol generally and specifically upon appellant's actual state of mind, coupled with testimony by toxicologist Slade that a person with a blood-alcohol level of .22 or thereabouts might misperceive data, draw faulty conclusions, and make poor or rash decisions based thereon, provided the jury with far more than the essence of the stricken testimony. Any error in striking Rosenthal's opinion on the ultimate issue of appellant's actual mental state was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].) Appellant was not denied due process of law in the circumstances of this case.

The judgment is affirmed.

Smith, J., and Peterson, J.,* concurred.

A petition for a rehearing was denied November 30, 1992, and appellant's petition for review by the Supreme Court was denied February 18, 1993.

---

*Presiding Justice of the Court of Appeal, First District, Division Five, sitting under assignment by the Chairperson of the Judicial Council.