Filed 6/13/24  P. v. Estrada CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SER ALEX-CORNEL ESTRADA,<br><br>Defendant and Appellant. | A165027<br><br>(Contra Costa County<br>Super. Ct. No. 05-172242-0) |

In December 2021, a jury convicted Ser Alex-Cornel Estrada of second-degree murder. He appeals and argues the trial court erred by instructing the jury in a way that precluded it from considering expert testimony concerning imperfect self-defense and by improperly sustaining evidentiary objections during the expert's testimony. We affirm.

## BACKGROUND

In August 2017, an employee at a rural sand mine found Aleli Avila's body. When sheriffs arrived around 4:00 p.m., they found the victim naked, on her back, legs spread, wrists bound above her head, and covered in blankets, towels, and sleeping bags. According to employees, the body was left sometime after 3:00 p.m. Surveillance video showed a blue minivan on the sand mine's road around that time. Sheriffs located the van's owners, who had lent it to Estrada that afternoon. He picked up the van with his cousin "Rod."

1

An autopsy revealed Avila died from strangulation — evident from bruising and a hyoid fracture in her neck. She was five feet, four inches tall and weighed 112 pounds. She suffered abrasions on her arms, multiple skull fractures, and three significant lacerations — some revealing bone. Repeated strikes caused the injuries to her head. Criminologists found Estrada's DNA under Avila's fingernail, and both of their DNA was found on the ligature binding her hands. At the time of her death, she had "extremely high" levels of methamphetamine and amphetamine in her body.

In October 2017, sheriffs searched Estrada's home. They found a blood-stained six-inch trophy and decorative pillow, and pieces of a ceramic mug in his side yard. During a sheriff interview, he denied knowing Avila and did not answer when asked why she was killed. He acknowledged driving the van and said he and Rod were looking for Rod's friend. At the time of the search, he was six feet, three inches tall and weighed about 220 pounds. Two days later, sheriffs searched his home again. They found blood in his hallway and on his bedroom walls, carpet, and exposed concrete where carpet had been torn away. They found insect larvae on the concrete and more pieces of the ceramic mug. Later testing revealed the blood on the trophy, mug, and bedroom wall were Avila's.

The prosecutor charged Estrada with murder and alleged he personally used a deadly weapon. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1); subsequent undesignated statutory references are to this code.)

Estrada testified to the following: two nights before sheriffs found Avila's body, he was at Rod's San Francisco apartment using methamphetamine. The two were driving around when they spotted Avila, who Estrada testified was Rod's girlfriend and a prostitute. They pulled over, and Rod spoke with Avila; he told Estrada they were taking her to San

Rafael. Estrada agreed, but he first wanted to rest at home. When they arrived at his house, he told Rod and Avila to remain in the garage. He walked through the house to confirm his wife and children were there, and he returned with towels so Rod and Avila could wash up. They were using methamphetamine. Estrada told them they could use the bathroom just inside the home by the garage but couldn't go any further into the house. He went to his room and fell asleep watching television.

He admitted killing Avila but said it was in self-defense. He woke up and saw her wrapped in a towel. She had his jacket, necklace, and car keys. Scared and confused, he asked her what was going on. She turned and looked at him "like somebody possessed," threw a trophy at him, and then lunged. They fell with her on top of him. She started hitting and "wailing on" him. He hit her back, and tried to "push her off" by her neck. He hit her on the forehead with the trophy, but she still wouldn't stop. So he hit her with the mug and "blacked out"; when he awoke on the ground, she lay dead next to him.

The following day, Estrada picked up Rod — who had returned to San Francisco — and told him Avila died. Rod wasn't shocked; the two returned to Estrada's home and slept in the garage. The next day, Rod cleaned up Estrada's room. He bound Avila's wrists to make her "easier to move" and wrapped her in sleeping bags and rugs before they moved her to the van. They left her by the sand mine and returned the van clean.

Estrada testified he had a traumatic childhood. His father hit him as a child, once breaking his shoulder. Rod — 15 years older than Estrada — sexually and physically abused him. He nevertheless viewed Rod as a brother. He used drugs — including methamphetamine — to cope with the abuse.

3

Defense expert Dr. David Joseph testified about the effect that pervasive childhood trauma can have on an adult. He opined it can impair the brain's ability to think rationally, manage emotions, and process reality in an accurate way under stress. It also can result in a flight-or-fight response that is "more severe, more extreme," lasts longer, and "happen[s] faster." The "slightest sign" of impending trauma can trigger the response. Trauma can also cause disassociation under stress. The disassociation can be experienced as a blackout or grey out, causing a person to recall the traumatic memory in slightly different versions over time. It's common for people who've been abused to maintain relationships with their abusers.

Joseph began opining specifically about Estrada. He concluded that — at the time of the killing — Estrada suffered from psychological consequences due to his traumatic history. He struggled to keep "anger at a reasonable level and not a destructive level." Under stress, he struggled with clear thinking and disassociation. He opined Estrada "is particularly sensitive to the perception of threat, and when he has a perception of threat, he often has a fairly extreme reaction." "Estrada has a very sensitive and reactive fight or flight response. . . . [O]nce he's there, it's intense and may last . . . long." He believed Estrada experienced blackouts in high-stress situations.

During his closing argument, the prosecutor argued Estrada's version of events wasn't credible. Avila was "weaker" and "smaller" than him — he was six feet three inches tall and weighed 185 pounds at the time of the killing. Given his size and strength, binding her hands to move her didn't make sense, and the bruising on her wrists indicated someone bound her before she died. His story also changed multiple times. The first time he spoke with sheriffs, he denied knowing Avila after they showed him a picture of her. He also never told the sheriffs, after being detained for murder, that

he acted in self-defense. He told yet another story to Joseph when they first met. He said Avila tried to escape after throwing the trophy at him. At his second meeting with Joseph, he said Avila lunged at and hit him after throwing the trophy. After "coming to" with his hands around her neck, he hit Avila with the mug because he was "pissed," not because he feared for his or his family's lives.

During his closing argument, defense counsel spent considerable time connecting Estrada's childhood trauma to his mental state during the killing. Counsel discussed the concepts of imperfect self-defense, murder, and the prosecution's burden of proof, and he also addressed the relevance of Joseph's testimony to Estrada's mental state. For example, he argued Estrada responded to Avila "in self-defense and in defense of his family" and therefore wasn't guilty of murder. He also described the lasting effects of Estrada's trauma and argued he "believed in those moments that he and his family were in imminent danger" of death or great bodily injury, and that he "needed to use deadly force."

The jury found Estrada guilty of second-degree murder and found true the deadly weapon allegation. The trial court sentenced him to 15 years to life in prison with a one-year consecutive term enhancement, for a total of 16 years to life.

## DISCUSSION

Estrada advances two claims of error. We address each argument in turn.

## I.

Estrada first contends the trial court's instructions prevented the jury from considering Joseph's testimony when determining whether Avila was

killed in imperfect self-defense. We disagree.[1]

At the outset, we provide some additional background. The trial court instructed the jury with CALCRIM Nos. 500 and 520 — the pattern jury instructions on homicide and murder. CALCRIM No. 520 stated murder is a physical act that caused the death of another, committed with malice aforethought. The court explained there are two kinds of malice, express and implied. Express malice exists if the defendant intended to kill. Implied malice exists if the defendant intended the act; the natural and probable consequence of the act were dangerous to human life; at the time he acted he knew the act was dangerous to human life; and deliberately acted with conscious disregard for human life.

The trial court also gave CALCRIM No. 3428, the pattern jury instruction on mental impairment evidence. It instructed the jury it may consider mental defect evidence "only for the limited purpose of deciding whether, at the time of the charged crime, he acted with the intent or mental state required for that crime." The court instructed, "[t]he people have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state — specifically, malice aforethought."

Next, the trial court gave CALCRIM No. 571, the pattern jury instruction on voluntary manslaughter. The instruction told the jury a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in 'imperfect' self-defense or defense of another." A "defendant acted in imperfect self-defense" if "[h]e actually believed that he or another person was in imminent

---

[1] Although Estrada admits he did not object to the instruction, we review his claim of instructional error to the extent it affected his substantial rights. (§ 1259; *People v. Townsel* (2016) 63 Cal.4th 25, 59–60.)

danger of being killed or suffering great bodily injury," and "[h]e actually believed that the immediate use of deadly force was necessary to defend against the danger," but "[a]t least one of those beliefs was unreasonable." It also indicated that, while "evaluating the defendant's beliefs," the jury should "consider all the circumstances as they were known and appeared to the defendant." The prosecutor has "the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or defense of another."

We review de novo claims of instructional error and evaluate whether the trial court fully and fairly instructed on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) We also presume jurors are intelligent and capable of understanding and applying the instructions they're given. (*People v. Lewis* (2001) 26 Cal.4th 334, 390.) " 'Instructions should be interpreted . . . to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ramos*, at p. 1088.) We must also "consider the arguments of counsel in assessing the probable impact of the instruction." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

Estrada has not demonstrated a reasonable likelihood the jury understood the instructions in the way he posits. (*People v. Solomon*, *supra*, 49 Cal.4th at p. 822; *People v. Young*, *supra*, 34 Cal.4th at p. 1202.)

7

CALCRIM No. 3428 told jurors they could consider evidence of his mental defect for the "limited purpose of deciding whether, at the time of the charged crime, he acted with the intent or mental state required for that crime." Although murder was the charged crime, the jurors were also instructed that voluntary manslaughter is a lesser included offense of murder and that imperfect self-defense reduces murder to voluntary manslaughter. The trial court instructed that if the jury found Estrada "*actually believed* that he or another person was in imminent danger of being killed or suffering great bodily injury" and "*actually believed* that the immediate use of deadly force was necessary," he acted in imperfect self-defense if either or both beliefs were unreasonable. (CALCRIM No. 571, italics added.) It also told the jury that, when "evaluating the *defendant's beliefs*, consider all the circumstances as they were *known and appeared to the defendant.*" (*Ibid.*, italics added.) In other words, CALCRIM No. 3428 expressly authorized the jury to use mental defect evidence — including Joseph's testimony — in assessing whether Estrada acted in imperfect self-defense, since his mental state when he killed and his belief in the need for deadly force were one and the same. We presume the jury correctly understood this correlation. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.)

Moreover, defense counsel's closing argument underscored the link between imperfect self-defense and Estrada's mental state. (*People v. Young*, *supra*, 34 Cal.4th at p. 1202 [counsels' arguments considered in assessing the probable impact of the instruction on the jury].) Counsel spent a significant portion of his closing argument explaining the mental states for murder, imperfect self-defense, the prosecution's burden in proving them, and the relevance of Joseph's testimony. As just one example, he discussed Joseph's opinion concerning the lasting effects of Estrada's trauma, and counsel

8

argued that, because of that trauma, Estrada believed "he and his family were in imminent danger" and he "needed to use deadly force." Estrada concedes the prosecutor did not object to or otherwise attack the connection between imperfect self-defense and the mental state for murder, and instead argued Joseph's opinion was unreliable as it relied on Estrada's version of the killing. And the record suggests the jury appreciated the significance of Joseph's testimony — they requested two readbacks of it while deliberating.

Estrada argues his claim mirrors *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, but that case is distinguishable. There, the trial court explicitly limited the jury's consideration of mental defect evidence to " 'intent to kill' " and " 'premeditation and deliberation.' " (*Id.* at p. 1405.) The Court of Appeal concluded this was error, but it was harmless. (*Id.* at pp. 1410–1411.) Here, the trial court did not expressly limit the jury's consideration of mental defect evidence to whether Estrada had " 'intent to kill,' " but indicated they could consider it when deciding his "intent or mental state" when he killed. No error appears.

## II.

Estrada next argues the trial court erred by sustaining two prosecutorial objections to Joseph's testimony. He contends the alleged error was prejudicial because it prevented the jury from hearing Joseph's opinion on how Estrada's trauma could affect a person's mental state under circumstances like Estrada's version of the killing. We are unpersuaded.

We provide some additional background. The objections at issue concerned questions containing hypothetical scenarios closely mirroring Estrada's testimony. Defense counsel asked Joseph, "if someone who has a history of pervasive childhood and physical [and] sexual trauma . . . wakes up to someone in his room stealing from him, suddenly throwing a trophy at him

9

and physically attacking him, could his history of trauma impact his response?" Joseph answered yes. Counsel then asked Joseph to "explain how or what that would look like." The trial court sustained the prosecutor's objection that the question was vague and called for an improper opinion. Defense counsel continued: "in the same scenario, if the person who attacked him had very high levels of methamphetamine in their system, who was described as acting crazy and like someone possessed, was on top of him and did not stop physically attacking him after being struck multiple times, could that affect or trigger the person with the history of trauma's fight or flight response?" Joseph answered yes. Counsel then asked, "[i]n what ways?" The court sustained an objection that the question called for an improper opinion. At the next break, the court explained the hypothetical questions would have elicited "a predictive opinion on specific facts that would basically have the effect of him, the witness, telling the jury what he thought the defendant's reaction was" when he killed Avila.

After the objections, defense counsel asked about physical and sexual trauma's effect on the fight-or-flight reaction. Counsel asked, if "someone has a history pervasive of physical and sexual trauma and is attacked, does that trigger their fight or flight," and Joseph answered yes. He elaborated that, "[i]n somebody who has experienced interpersonal trauma, being attacked, being sexual[ly] assaulted and raped, being physically assaulted, you would expect — actually, for most of us, whether we have trauma or not, that our fight or flight would be activated by somebody attacking us. And certainly even more so with someone that had those kinds of trauma."

"Sections 28 and 29 limit the type of testimony experts may provide in criminal cases." (*People v. Herrera* (2016) 247 Cal.App.4th 467, 475.) "Section 28 prohibits '[e]vidence of mental disease, mental defect, or mental

10

disorder . . . to show or negate the *capacity* to form any mental state.' " (*Ibid.*) "Such evidence 'is admissible solely on the issue of whether or not the accused *actually* formed a required specific intent.' " (*Ibid.*) "Section 29 prohibits 'any expert testifying about a defendant's mental illness, mental disorder, or mental defect' from discussing 'whether the defendant had or did not have the required mental states . . . for the crimes charged.' " (*Id.* at pp. 475–476.) These sections allow the presentation of " 'expert testimony about any . . . mental condition' " the defendant may have, or how that " 'condition affected him at the time of the offense, as long as the expert does not . . . state an opinion that the defendant did or did not have the intent . . . required for conviction.' " (*Id.* at p. 476.)

In general, we review the trial court's exclusion of evidence for abuse of discretion. (*People v. Herrera, supra,* 247 Cal.App.4th at p. 475; *People v. Cortes* (2011) 192 Cal.App.4th 873, 908.) We review improper limitations on the questioning of an expert witness for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 120 [violations of state evidentiary rules generally do not rise to the level of federal constitutional error]; *Herrera,* at p. 478.)

Even if the trial court erred in sustaining the objections, any error was harmless. (*People v. Cortes, supra,* 192 Cal.App.4th at p. 913 [evaluating for reasonable probability that defendant would have obtained a more favorable result if jury had been permitted to hear excluded answer].) The admitted portions of Joseph's testimony clearly set forth his opinion as to how a person with Estrada's history would react to his version of the facts; there's no reasonable probability of a different result had the objections been overruled. (*People v. Rangel* (1992) 11 Cal.App.4th 291, 300 [limiting expert opinion on defendant's capacity to form mental state harmless where extensive

11

testimony elicited on the subject].)[2]  Joseph expressly opined that a traumatic history like Estrada's would affect a person's response to the circumstance of waking up "to someone in his room stealing from him, suddenly throwing a trophy at him and physically attacking him."  He also opined that — if the attacker "had very high levels of methamphetamine in their system," acted "crazy and like someone possessed," and "did not stop physically attacking . . . after being struck multiple times" — the attack would trigger a person with Estrada's history into fight or flight.  On this record, we conclude there's no reasonable probability of a different result had the objections been overruled.

## DISPOSITION

The judgment is affirmed.

---

[2] We reject Estrada's cumulative error argument.  We assumed error as to his second claim but found it harmless.  (*People v. Vieira* (2005) 35 Cal.4th 264, 305 [cumulative error claim meritless where only one harmless error found].)

_____

RODRÍGUEZ, J.

WE CONCUR:

_____

TUCHER, P. J.

_____

FUJISAKI, J.

A165027