Filed 5/5/25  P. v. Twine CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDWARD TWINE,<br><br>        Defendant and Appellant. | A169814<br><br>(Alameda County<br>Super. Ct. No. 21CR009285) |

Defendant Edward Twine appeals a judgment entered upon a jury verdict finding him guilty of murder and other offenses.  His sole contention on appeal is that the trial court abused its discretion in limiting expert testimony of his mental deficits, which he offered to support his defense that he did not act with implied malice or reckless indifference to human life.  We affirm.

**FACTUAL AND PROCDURAL BACKGROUND**

**I.      The Crime and Investigation**

The victim of defendant's crimes was Halia Gebrezghi.  On the night of July 10, 2021, Gebrezghi's brother, A.K., was sitting in his car near the warehouse where Gebrezghi grew marijuana.  A.K. watched out for his brother because Gebrezghi, who made a substantial amount of money, bought and displayed expensive goods, including Rolex watches.  Gebrezghi was near

his own truck just outside the warehouse, and A.K. saw him waving his hands.  A.K. drove over to Gebrezghi, and when he got there A.K. saw "two guns pointed at [him]," held by two people with their faces covered with black masks, wearing black gloves and clothing.  Gebrezghi reached into his truck for a gun, and A.K. saw him drop down, having been struck by gunfire.  One of the suspects ran away, and the other fell and his gun slid behind Gebrezghi's truck, and A.K. picked it up and shot at the second suspect.  The second suspect ran away.

Gebrezghi suffered two gunshot wounds, one of which, to his heart and left lung, was fatal.

A bystander who came to the scene to help saw Gebrezghi lying on his back, with a watch next to him as if it had fallen off his wrist.  He moved the watch under the truck because it looked "really expensive" and he did not want anyone to take it.

Officers who responded found blood and what appeared to be teeth near the rear of the truck, but Gebrezghi did not have any injuries to his mouth or jaw.  After making inquiries, an officer learned that a gunshot victim, later identified as defendant, was at a local hospital.  Defendant had a gunshot wound to his lip and cheek area.  Three of his teeth were missing, and he had not brought the missing teeth with him.  Analysis from the teeth and from some of the blood later showed DNA consistent with that of defendant.

Near the blood droplets and teeth, officers found a Rolex watch with its clasp open, as well as bullet casings from two different types of weapons.

A police detective testified that marijuana businesses are "prime targets" for robberies and burglaries because they contain large amounts of both cash and marijuana.

2

## II.     Defendant's Expert Testimony

Defendant presented evidence by two psychologists in support of his theory that he did not act with malice because his brain was still at an adolescent stage of development and he had mental deficits that prevented him from being subjectively aware of the possible consequences of his actions. Relevant to this evidence, defendant was 24 years old at the time of the crime.

Dr. Paul Martin, a clinical psychologist, testified as an expert in psychological and neuropsychological assessments.  He had carried out a psychological assessment of defendant in March 2020 for the purpose of determining eligibility for social supplemental income (SSI), when defendant was 23 years old.  The evaluation took about an hour.  The standard tests for such an assessment included an I.Q. test, a memory test, a measure of cognitive impairment, and a "trail-making test," which was a "measure of mental tracking" that provided a measure of prefrontal cortex and executive functions.  In the tests, defendant scored in the "extremely low range" for immediate memory, comprised of tests for logical memory and visual reproduction, and in the "delayed memory index" (recalling a story or visual stimulus).  At the time of the examination, Dr. Martin did not expect significant change in the next 12 months, the horizon applicable to eligibility for SSI benefits.

Another psychologist, Dr. Alisa Crovetti, testified as an expert in child and adolescent development; neuropsychology development; and assessment, diagnosis, and treatment of neurodevelopmental disorders.  The limitations the trial court placed on her testimony, both at a hearing pursuant to Evidence Code section 402 outside the presence of the jury and when the

3

court struck testimony the jury actually heard, are at the heart of defendant's challenge on appeal and will be discussed in detail below.

### Dr. Crovetti's Initial Trial Testimony

In the presence of the jury, Dr. Crovetti explained that the field of psychology recognizes a difference between the "adolescent brain" and the "adult brain." A typical age range for a male to have an adolescent brain is 14 to 25 years, although that range might be extended to age 28 for men with developmental disabilities. At age 23, defendant's age at the time of the evaluation, a male generally still has "features of an adolescent brain." The brains of those with intellectual disability, such as an I.Q. that is significantly below average, may always function like a younger brain.

The frontal lobe is the last part of the brain to develop, and it does not function at its full capacity during the period a person has an adolescent brain. It governs executive functioning, such as planning, organization, problem solving, and sustained attention, as well as impulse control. The reward center, located deeper in the brain, is less responsive to stimuli in the adolescent brain than in the adult brain, leading adolescents to need higher levels of stimulation—or risk—to experience a sense of reward. Adolescents experience a sense of reward when with their peers, and they are more susceptible to peer pressure than those with adult brains, and more likely to make risky decisions as a result of that pressure. Adolescents are "notoriously bad at assessing risk." Because of their lower capacity for impulse control, and because the reward center is attracted toward riskier, more exciting activities and to peer pressure, their "decision-making around risk tends to be very problematic."

Dr. Crovetti had never met defendant, but she had reviewed Dr. Martin's report. She testified that the scores on the tests Dr. Martin

4

administered were consistent in showing global delays in intellectual functioning. The tests showed a "full scale I.Q. score" of 66, falling within the first or second percentile, meaning 98 out of 100 people would score higher. That score was consistent with a mild intellectual disability, and a person with that score would be "extremely low functioning."

Dr. Crovetti continued: a person with an intellectual disability might appear normal in terms of recreational interests and personal care activities, but might find it difficult to hold down a job that was more than "very basic," might need help organizing activities, and might have difficulty reading social cues and be vulnerable to manipulation. Defendant's own scores indicated he might have difficulty in academic tasks above a fourth or fifth grade level; his "[c]onceptual problem-solving is probably never going to advance . . . beyond what we would see in early childhood"; and he would never reach a stage of thinking abstractly and weighing variables when making a decision. The "overall verbal comprehension index" score was a 70, at the third percentile, predicting difficulty with tasks such as learning to read and write and learning through language (suggesting skills at a level between second and sixth grade), and conversational skills at the level of someone in fourth through sixth grade. The scores showed a "very deficient" ability to understand abstract language concepts, and a poor vocabulary, indicating low understanding of basic facts about the world.

After Dr. Crovetti offered this testimony, an unreported discussion between the trial court and the counsel took place, and the court then gave the jury this admonition: "All of Dr. Crovetti's testimony as to age functioning, developmental age functioning, academic level functioning for a person with the scores indicated in the report that was prepared by Dr. Martin is stricken from the record. That is stricken . . . pursuant to Evidence

5

Code section 352.  [¶] Also pursuant to Penal Code section 28 in that the testimony intrudes upon the purview of the trier of fact, namely, the jury. And any determination in terms of . . . if or whether an accused actually formed a specific—a requisite specific intent for the crime charged is within the purview of the jury.  That's for the jury to determine.  [¶] So all of that testimony given thus far by Dr. Crovetti is stricken from the record."

### *Dr. Crovetti's Continued Testimony*

After this instruction, Dr. Crovetti continued testifying, reiterating that defendant's "full-scale I.Q. score" of 66 was extremely low, in the first percentile.  She then elaborated.  His score of 70 on the verbal comprehension index test fell in about the third percentile.  His score in the "perceptual reasoning index" was 75, in the borderline range.  This index measures intellectual functioning that is "language free," such as "hands-on reasoning, visual-spatial reasoning, language free problem solving."  On one sub-test, which measures a person's ability to analyze a set of facts and draw a logical conclusion, defendant fell into the borderline range, about the third to fifth percentile.  Dr. Crovetti also testified to defendant's borderline scores in working memory (the ability to hold multiples pieces of information in mind, analyze them, and respond to them), a score in the second percentile; and his extremely low score in processing speed (the speed with which ones takes in and produces information), a score in the first percentile.  His "functional assessment," measuring employment-related skills, showed multiple areas of deficit.  Defendant's scores were consistent with mild intellectual disability and mild neurocognitive disorder.  A person with his scores would have "unsophisticated" reasoning skills, "at a very concrete level," as if "the word reasoning might not even apply to what these individuals are able to do with information."

6

Dr. Crovetti explained that because she had not met and assessed defendant herself, her views were not a diagnosis of him. She specifically admitted she had "never assessed his ability to appreciate the risks of his conduct."

Defense counsel asked Dr. Crovetti whether she would expect a 24-year-old with defendant's scores to have an adolescent brain, and the trial court sustained an objection to the question.

After Dr. Crovetti finished testifying and the jury was excused, the parties and the court held a discussion on the record to memorialize their earlier, unreported exchange. The court explained that its reasons for striking the evidence regarding age and grade level functioning had been that the testimony risked confusing the issues and misleading the jury under Evidence Code section 352, and that it potentially violated Penal Code section 28 and invaded the province of the jury, the trier of fact.[1]

### *Limits on Dr. Crovetti's Testimony at 402 Hearing*

In a hearing under Evidence Code section 402, before Dr. Crovetti testified in front of the jury, the trial court sustained objections to some of her proposed testimony, specifically regarding what developmental age corresponded to defendant's I.Q. score and other test scores (because Dr. Crovetti lacked personal knowledge, never having met defendant); about stereotypes associated with people who had developmental or intellectual disabilities (on grounds of relevance); and about whether the deficits reflected in defendant's test scores would affect a person's ability to recognize or conceptualize the unintended consequences of his or her actions (on the ground that it intruded on the jury's duty to determine defendant's mental

---

[1] All undesignated statutory references are to the Penal Code.

state (§ 29)).  Similarly, the court sustained an objection when defense counsel asked, "[H]ypothetically, if a 24-year-old person with [those] scores were to participate in an armed robbery or burglary with peers involving running at the victim with loaded guns pointed at him, is it possible that person might only be thinking of the desired outcome, they're going to acquire some money or valuables and not actually think of other possible outcomes such as someone being killed?"

Before Dr. Crovetti testified, the trial court also ruled that she could testify about the meaning of a mild impairment but could not provide more specific information about how that information "relates specifically perhaps to Mr. Twine or somebody who [had] test scores similar to Mr. Twine."  This was in response to the prosecutor's objection to any testimony about defendant's "mental age," or about how defendant's I.Q. suggested he would perform in any particular situation.

## III.   Trial, Verdict, and Sentence

The jury was instructed that it could consider the evidence of defendant's neurocognitive disorder or intellectual deficit only for the limited purpose of deciding whether he acted with the necessary intent or mental state.  For first degree felony murder, that intent was defined as "the intent to commit or attempt to commit, or aid and abet a perpetrator in committing or attempting to commit the felony of robbery," or "reckless indifference to human life—a defendant knowingly engages in criminal activity that he knows involves a grave risk of death."

The jury found defendant guilty of first degree felony murder (§ 187, subd. (a); count 1), on a theory either that (1) he was the actual killer and was a participant in the robbery or attempted robbery that resulted in Gebrezghi's death or (2) he was a major participant in the robbery or

8

attempted robbery and acted with reckless indifference to human life (§ 189, subd. (e)(3)).[2] In connection with this count, the jury found true that defendant was armed with a firearm (§ 12022, subd. (a)(1)) and that he personally and intentionally discharged a firearm and caused great bodily injury or death (§§ 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (c) & (d)). The jury also found defendant guilty of attempted robbery (§§ 211, 664; count 2), with associated firearm and great bodily injury allegations; unlawful possession of a firearm (§ 29800, subd. (a)(1); count 3); carrying a loaded firearm in a city (§ 25850, subd. (a); count 4), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 5). The trial court thereafter found true various prior convictions and aggravating factors.

The trial court imposed a prison term of 25 years to life for count 1, struck the enhancement under section 12022.53, subdivisions (c) and (d) and imposed a lesser-included 10-year firearm enhancement (§ 12022.53, subd. (b)), and stayed the other enhancements. The terms for the remaining counts were either stayed or concurrent. The total prison term was 35 years to life.

## DISCUSSION

On appeal, defendant contends the trial court abused its discretion in limiting Dr. Crovetti's testimony about his mental deficits. Defendant points out that the jury's verdict leaves open the question of whether he was the

---

[2] The verdict form for count 1 specified that the jury found defendant guilty of first degree murder in that he "was the actual killer of Halia Gebrezghi and was a participant in the perpetration and/or attempted perpetration of the crime of robbery that resulted in the death of Halia Gebrezghi. [¶] and/or [¶] . . . [he] was a participant in the perpetration and/or attempted perpetration of the crime of robbery and that [he] was a major participant in the above felony and acted with reckless indifference to human life." (Block capitalization omitted.)

9

actual killer or whether he was an aider and abettor who acted with reckless indifference to human life. And, he argues, to the extent the verdict was based on a theory of aiding and abetting, the court's ruling deprived him of his right to present a complete defense that he did not act with reckless indifference.

Expert testimony is admissible if it is " ' "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. McDowell* (2012) 54 Cal.4th 395, 425–426.) The trial court has "broad discretion" in deciding whether to admit such testimony, and we review its ruling for abuse of discretion. (*Id.* at p. 426.)

However, " 'the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case.' " (*People v. Herrera* (2016) 247 Cal.App.4th 467, 475.) That is because "a criminal defendant is constitutionally entitled to present all relevant evidence of significant probative value in his favor." (*People v. Marshall* (1996) 13 Cal.4th 799, 836.) We review independently " ' "mixed question determinations affecting constitutional rights." ' " (*Herrera*, at p. 475.) To the extent a trial court's ruling is based on a conclusion of law, such as interpretation of a statute, our review is de novo. (*People v. Walker* (2006) 139 Cal.App.4th 782, 795; *Herrera*, at p. 475.)

One theory of the defense was that to act with reckless indifference to human life, defendant must have been subjectively aware that his actions involved a grave risk of death. According to defendant, the testimony of Dr. Martin and Dr. Crovetti was relevant for two purposes. First, it suggested that he had an adolescent brain, making it difficult for him to assess risk, and that as a result his focus that night was only on his desire to acquire

money or valuable property, not on the consequences of his actions. Second, defendant had a neurocognitive impairment—and an I.Q. of 66—raising questions about whether he was actually aware at the time of the crime of the grave risk caused by his behavior. Defendant contends that Dr. Crovetti's excluded testimony would have explained how his mental deficiencies affected his awareness of the consequences of his actions and caused him to focus solely on the rewards to be obtained from the robbery.

Section 28 provides that evidence of a mental disease, defect, or disorder is inadmissible to show the *capacity* to form a mental state, but is admissible "solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).)

Section 29 provides that in the guilt phase of a criminal trial, an expert "shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." This provision applies not only to express evidence of a defendant's mental state at the time of a crime, but also to an expert "couching an opinion in words which are or would be taken as synonyms for the mental state involved." (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 (*Nunn*).)

Defendant's argument centers in significant part on the trial court's exclusion of evidence of the correlation of his test scores to age and grade levels. He recognizes that evidence strays into territory barred by sections 28 and 29 if it amounts to an opinion on the ultimate question of whether a person had a particular mental state at the time of the crime. (See *Nunn,*

*supra*, 50 Cal.App.4th at pp. 1362, 1364–1365 [testimony that defendant fired weapon impulsively due to tendency to overreach and inebriation].) He also recognizes that expert opinion may not be offered on whether a person had the *capacity* to form a mental state necessary for the offense charged offense. (*People v. Coddington* (2000) 23 Cal.4th 529, 582 (*Coddington*), superseded by statute on other grounds as stated in *People v. Nadey* (2024) 16 Cal.5th 102, 150 and overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 & fn. 13.) But, he argues, the evidence of age and grade correlations was not offered for these prohibited purposes, but simply to illustrate his cognitive impairment in terms more comprehensible to the jury than bare test results.

There might well be merit to this argument, if the trial court's ruling on this point had been based only on sections 28 and 29. But the court expressly based this ruling on independent grounds, including that Dr. Crovetti lacked personal knowledge of defendant's developmental or functional cognitive age because she had not examined him and that evidence of developmental age and academic level functioning had the potential to confuse the issues and mislead the jury (Evid. Code, § 352). In his opening brief, defendant makes no argument challenging this basis for the trial court's ruling. And, in our view, section 352 of the Evidence Code provides an adequate ground to exclude the evidence in this case.

Evidence Code section 352 allows the trial court, in its discretion, to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger . . . of confusing the issues, or of misleading the jury." The trial court could reasonably conclude that evidence of the developmental age and grade-level functioning of a person with defendant's test scores would confuse and

mislead the jury by causing it to consider a question not before it—what cognitive abilities a child "between a second and sixth grade level" would have—and how those abilities related to defendant's mental state at the time of the killing. For context, Dr. Crovetti was allowed to explain that defendant's I.Q. of 66 was extremely low, in the first percentile; that his scores in specific areas, including language-free problem solving, the ability to analyze facts and draw logical conclusions, and the ability to analyze and respond to multiple pieces of information, variously fell in the first to fifth percentiles; and that a person with these scores would have reasoning skills so unsophisticated that "the word reasoning might not even apply." While some jurors might have appreciated also hearing the age- and grade-level comparisons the court chose to exclude, there is an argument that continuing down this path with ever-greater detail risked confusing the jury. (See *Greener v. M. Phelps, Inc.* (2024) 107 Cal.App.5th 1080, 1086, 1108–1109 [where jury had already heard evidence of plaintiff's skill in jiu jitsu, evidence of his experience in other grappling sports properly excluded because likely to confuse jury with tangential matters].)

Moreover, the court could reasonably look to the fact that Dr. Crovetti had never met or assessed defendant, and so had no personal knowledge of his condition. This was important for two reasons. First, because she had never met him, Dr. Crovetti was unable to diagnose defendant's condition and could only speak in generalities. Second, Dr. Crovetti had no opportunity to supplement the testing Dr. Martin had done, which was undertaken for a different purpose and did not include an assessment of defendant's ability to assess risk. Because of these inherent limitations on her testimony and because Dr. Crovetti was allowed to share with the jury general information about the meaning of defendant's test scores and the workings of an

13

adolescent brain, we conclude there was no abuse of discretion in the trial court's exclusion under Evidence Code section 352 of the evidence regarding defendant's developmental age.

Defendant argues, however, that the trial court's admonition when striking this evidence left the jurors uncertain of what testimony they were to disregard. As a result, he suggests, the jury likely ignored all of Dr. Crovetti's testimony, depriving him of his ability to present his defense and persuade the jury that he was thinking only of the anticipated rewards of a successful robbery without appreciation of the risk of harm inherent in his actions. We are not persuaded. The court defined the stricken testimony as "age functioning, developmental age functioning, academic level functioning" for a person with defendant's scores. We think this language, while not a model of clarity, would best have been understood as referring to Dr. Crovetti's testimony correlating defendant's scores to a particular age or grade level.

To the extent there is an argument the jury might have construed the court's instruction more broadly, we think the facts suggest they did not in this case. First, we observe that some of Dr. Crovetti's testimony before the admonition was completely unconnected to a person with defendant's test scores, so it would be difficult to construe the admonition as reaching it. In particular, Dr. Crovetti testified about the differences between an adolescent brain and an adult brain in terms of executive functioning, impulse control, the amount of stimulation needed to gain a sense of reward, and the importance of peer groups, and also about the length of time a male typically has an adolescent brain. Second, although Dr. Crovetti testified before the admonition to the meaning of the scores reflected on Dr. Martin's report, she continued providing similar testimony without objection after the

14

admonition.  The difference was that after the admonition she did not offer a developmental age or grade-level functioning in explaining the meaning of defendant's test scores.  Third, in his closing argument defense counsel relied, without objection, on Dr. Crovetti's testimony that adolescent brain development in a male typically lasts until about age 25, and that among the traits of an adolescent brain are difficulty in assessing risk, particularly in the moment, and susceptibility to peer pressure.  Based on this evidence, he argued that there were "real questions about whether a 24-year-old with mild neuro-cognitive impairment [whose] I.Q. is tested 66" was subjectively aware of the unintended consequences of his actions.

We are satisfied, in light of this evidence and in the absence of any affirmative evidence of jury confusion, that there is no basis to conclude the jury disregarded any testimony other than that specifically related to the age levels or grade levels associated with defendant's test scores.

In addition to his argument that the trial court abused its discretion in striking Dr. Crovetti's testimony regarding age or grade level functioning, defendant also challenges the trial court's ruling at the Evidence Code section 402 hearing excluding evidence of whether someone with defendant's cognitive deficits might not recognize or conceptualize the possible intended consequences of his action.  This proffered evidence, he contends, did not invade the province of the jury because it did not address the ultimate question of whether he harbored malice.  (See *People v. Cortes* (2011) 192 Cal.App.4th 873, 911 (*Cortes*) [improper to exclude evidence that defendant had diagnosable conditions that likely colored his perceptions of situation and impaired consciousness in certain ways]; *Coddington, supra*, 23 Cal.4th at pp. 582–583 [sections 28 and 29 prohibit evidence of whether a defendant actually harbored mental state]; *Nunn, supra*, 50 Cal.App.4th at p. 1365

15

[expert could testify that defendant's psychological condition could result in impulsive behavior].) As explained in *Cortes*, "sections 28 and 29 in fact leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of its twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime," that is, on the " 'ultimate fact whether a defendant had the required mental state for conviction of a crime.' " (*Cortes*, at pp. 910–911.)

It is not clear to us that, on this point, the disallowed question crossed over into forbidden territory. The question did not ask whether defendant *actually* realized the possible consequences of his actions, but whether someone with his test scores *might not* realize those consequences. While the testimony defendant sought to elicit might well have allowed the jury to infer that defendant did not harbor malice, a direct response to the question would not necessarily have stated, either directly or euphemistically, that he in fact did not. (See *Cortes*, *supra*, 192 Cal.App.4th at p. 912; *Nunn*, *supra*, 50 Cal.App.4th at p. 1364.)

But even assuming this ruling was an abuse of discretion, we see no prejudice from disallowance of this single question. The jury heard that the period of adolescent brain can last in a typical male until age 25—older than defendant was at the time of the crime—as well as evidence of the effects of adolescent brain, including lower ability to control impulses and the tendency to make risky decisions, particularly when around peers. It also heard ample evidence of defendant's low intellectual functioning, of the associated low capacity for problem solving, drawing logical conclusions, and responding to information, and of associated reasoning skills so low that "the word reasoning might not even apply." As the trial court noted, this evidence was

16

sufficient for the jury to determine whether defendant could appreciate the consequences of his actions. We see no possibility, under any standard, that the result would have been different had defendant been permitted to ask whether someone with his deficits might not appreciate the unintended consequences of his actions. (See *People v. Rangel* (1992) 11 Cal.App.4th 291, 303 [no prejudice where jury had before it evidence that was "far more than the essence" of excluded testimony].)

We are also mindful, in assessing prejudice, that in this case the jury found defendant had personally and intentionally discharged a firearm, causing great bodily injury or death. (See § 12022.53, subd. (d).) We think a person would have to be exceptionally impaired to be unaware of the risk to human life involved not only in participating in an armed robbery, but *also* in discharging a firearm in the process.

Defendant also argues briefly that the exclusion of Dr. Crovetti's testimony that people with intellectual disabilities do not look or behave in a visibly abnormal way was improper. But she testified that people with intellectual disabilities may look typical in terms of their personal care and grooming. And in any case, defendant does not explain the relevance of the evidence—the absence of which was the basis for the trial court's ruling—and we see no manner in which admission of additional evidence on this topic would have affected the result.

To the extent defendant challenges any other aspect of the trial court's rulings regarding the admissibility of evidence, he has not met his burden to show either abuse of discretion or prejudice.

## DISPOSITION

The judgment is affirmed.

17

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Twine* (A169814)

18